WARDEN, MARYLAND PENITENTIARY
*v.* HAYDEN.

No. 480.   Argued April 12, 1967.—Decided May 29, 1967.

*Franklin Goldstein,* Assistant Attorney General of Maryland, argued the cause for petitioner. With him on the brief was *Francis B. Burch,* Attorney General.

*Albert R. Turnbull,* by appointment of the Court, 385 U. S. 985, argued the cause and filed a brief for respondent, *pro hac vice,* by special leave of Court.

*Ralph S. Spritzer,* by special leave of Court, argued the cause for the United States, as *amicus curiae,* urging reversal. With him on the brief were *Solicitor General Marshall, Assistant Attorney General Vinson, Nathan Lewin* and *Beatrice Rosenberg.*

MR. JUSTICE BRENNAN delivered the opinion of the Court.

We review in this case the validity of the proposition that there is under the Fourth Amendment a "distinction

between merely evidentiary materials, on the one hand, which may not be seized either under the authority of a search warrant or during the course of a search incident to arrest, and on the other hand, those objects which may validly be seized including the instrumentalities and means by which a crime is committed, the fruits of crime such as stolen property, weapons by which escape of the person arrested might be effected, and property the possession of which is a crime." [1]

A Maryland court sitting without a jury convicted respondent of armed robbery. Items of his clothing, a cap, jacket, and trousers, among other things, were seized during a search of his home, and were admitted in evidence without objection. After unsuccessful state court proceedings, he sought and was denied federal habeas corpus relief in the District Court for Maryland. [2] A divided panel of the Court of Appeals for the Fourth Circuit reversed. 363 F. 2d 647. The Court of Appeals believed that *Harris* v. *United States*, 331 U. S. 145, 154, sustained the validity of the search, but held that respondent was correct in his contention that the clothing seized was improperly admitted in evidence because the items had "evidential value only" and therefore were not

---

[1] *Harris* v. *United States*, 331 U. S. 145, 154; see also *Gouled* v. *United States*, 255 U. S. 298; *United States* v. *Lefkowitz*, 285 U. S. 452, 465–466; *United States* v. *Rabinowitz*, 339 U. S. 56, 64, n. 6; *Abel* v. *United States*, 362 U. S. 217, 234–235.

[2] Hayden did not appeal from his conviction. He first sought relief by an application under the Maryland Post Conviction Procedure Act which was denied without hearing. The Maryland Court of Appeals reversed and remanded for a hearing. 233 Md. 613, 195 A. 2d 692. The trial court denied relief after hearing, concluding "that the search of his home and the seizure of the articles in question were proper." His application for federal habeas corpus relief resulted, after hearing in the District Court, in the same conclusion.

lawfully subject to seizure. We granted certiorari. 385 U. S. 926. We reverse.[3]

## I.

About 8 a. m. on March 17, 1962, an armed robber entered the business premises of the Diamond Cab Company in Baltimore, Maryland. He took some $363 and ran. Two cab drivers in the vicinity, attracted by shouts of "Holdup," followed the man to 2111 Cocoa Lane. One driver notified the company dispatcher by radio that the man was a Negro about 5'8'' tall, wearing a light cap and dark jacket, and that he had entered the house on Cocoa Lane. The dispatcher relayed the information to police who were proceeding to the scene of the robbery. Within minutes, police arrived at the house in a number of patrol cars. An officer knocked and announced their presence. Mrs. Hayden answered, and the officers told her they believed that a robber had entered the house, and asked to search the house. She offered no objection.[4]

---

[3] The State claims that, since Hayden failed to raise the search and seizure question at trial, he deliberately bypassed state remedies and should be denied an opportunity to assert his claim in federal court. See *Henry* v. *Mississippi*, 379 U. S. 443; *Fay* v. *Noia*, 372 U. S. 391. Whether or not the Maryland Court of Appeals actually intended, when it reversed the state trial court's denial of post-conviction relief, that Hayden be afforded a hearing on the merits of his claim, it is clear that the trial court so understood the order of the Court of Appeals. A hearing was held in the state courts, and the claim denied on the merits. In this circumstance, the Fourth Circuit was correct in rejecting the State's deliberate-bypassing claim. The deliberate-bypass rule is applicable only "to an applicant who has deliberately by-passed the orderly procedure of the state courts *and in so doing has forfeited his state court remedies.*" *Fay* v. *Noia, supra*, 372 U. S., at 438. (Emphasis added.) But see *Nelson* v. *California*, 346 F. 2d 73, 82 (C. A. 9th Cir. 1965).

[4] The state postconviction court found that Mrs. Hayden "gave the policeman permission to enter the home." The federal habeas corpus court stated it "would be justified in accepting the findings

The officers spread out through the first and second floors and the cellar in search of the robber. Hayden was found in an upstairs bedroom feigning sleep. He was arrested when the officers on the first floor and in the cellar reported that no other man was in the house. Meanwhile an officer was attracted to an adjoining bathroom by the noise of running water, and discovered a shotgun and a pistol in a flush tank; another officer who, according to the District Court, "was searching the cellar for a man or the money" found in a washing machine a jacket and trousers of the type the fleeing man was said to have worn. A clip of ammunition for the pistol and a cap were found under the mattress of Hayden's bed, and ammunition for the shotgun was found in a bureau drawer in Hayden's room. All these items of evidence were introduced against respondent at his trial.

## II.

We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, "the exigencies of the situation made that course imperative." *McDonald* v. *United States,* 335 U. S. 451, 456. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation

of historical fact made by Judge Sodaro on that issue . . . ," but concluded that resolution of the issue would be unnecessary, because the officers were "justified in entering and searching the house for the felon, for his weapons and for the fruits of the robbery."

if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

We do not rely upon *Harris* v. *United States, supra,* in sustaining the validity of the search. The principal issue in *Harris* was whether the search there could properly be regarded as incident to the lawful arrest, since Harris was in custody before the search was made and the evidence seized. Here, the seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape.

It is argued that, while the weapons, ammunition, and cap may have been seized in the course of a search for weapons, the officer who seized the clothing was searching neither for the suspect nor for weapons when he looked into the washing machine in which he found the clothing. But even if we assume, although we do not decide, that the exigent circumstances in this case made lawful a search without warrant only for the suspect or his weapons, it cannot be said on this record that the officer who found the clothes in the washing machine was not searching for weapons. He testified that he was searching for the man or the money, but his failure to state explicitly that he was searching for weapons, in the absence of a specific question to that effect, can hardly be accorded controlling weight. He knew that the robber was armed and he did not know that some

weapons had been found at the time he opened the machine.[5] In these circumstances the inference that he was in fact also looking for weapons is fully justified.

## III.

We come, then, to the question whether, even though the search was lawful, the Court of Appeals was correct in holding that the seizure and introduction of the items of clothing violated the Fourth Amendment because they are "mere evidence." The distinction made by some of our cases between seizure of items of evidential value only and seizure of instrumentalities, fruits, or contraband has been criticized by courts[6] and commentators.[7] The Court of Appeals, however, felt "obligated to adhere to it." 363 F. 2d, at 655. We today reject the distinction as based on premises no longer

---

[5] The officer was asked in the District Court whether he found the money. He answered that he did not, and stated: "By the time I had gotten down into the basement I heard someone say upstairs, 'There's a man up here.'" He was asked: "What did you do then?" and answered: "By this time I had already discovered some clothing which fit the description of the clothing worn by the subject that we were looking for . . . ." It is clear from the record and from the findings that the weapons were found after or at the same time the police found Hayden.

[6] *People* v. *Thayer*, 63 Cal. 2d 635, 408 P. 2d 108, cert. denied, 384 U. S. 908; *State* v. *Bisaccia*, 45 N. J. 504, 213 A. 2d 185. Compare *United States* v. *Poller*, 43 F. 2d 911, 914 (C. A. 2d Cir. 1930).

[7] *E. g.*, Chafee, The Progress of the Law, 1919–1922, 35 Harv. L. Rev. 673 (1922); Kamisar, The Wiretapping-Eavesdropping Problem: A Professor's View, 44 Minn. L. Rev. 891, 914–918 (1960); Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 478 (1961); Comment, 45 N. C. L. Rev. 512 (1967); Comment, 66 Col. L. Rev. 355 (1966); Comment, 20 U. Chi. L. Rev. 319 (1953); Comment, 31 Yale L. J. 518 (1922). Compare, *e. g.*, Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361 (1921); Note, 54 Geo. L. J. 593 (1966).

accepted as rules governing the application of the Fourth Amendment.[8]

We have examined on many occasions the history and purposes of the Amendment.[9]  It was a reaction to the evils of the use of the general warrant in England and the writs of assistance in the Colonies, and was intended to protect against invasions of "the sanctity of a man's home and the privacies of life," *Boyd* v. *United States,* 116 U. S. 616, 630, from searches under indiscriminate, general authority.  Protection of these interests was assured by prohibiting all "unreasonable" searches and seizures, and by requiring the use of warrants, which particularly describe "the place to be searched, and the persons or things to be seized," thereby interposing "a magistrate between the citizen and the police," *McDonald* v. *United States, supra,* 335 U. S., at 455.

Nothing in the language of the Fourth Amendment supports the distinction between "mere evidence" and instrumentalities, fruits of crime, or contraband.  On its face, the provision assures the "right of the people to be secure in their persons, houses, papers, and effects . . . ," without regard to the use to which any of these things are applied.  This "right of the people" is certainly unrelated to the "mere evidence" limitation.  Privacy is disturbed no more by a search directed to a purely evidentiary object than it is by a search directed to an instrumen-

---

[8] This Court has approved the seizure and introduction of items having only evidential value without, however, considering the validity of the distinction rejected today.  See *Schmerber* v. *California,* 384 U. S. 757; *Cooper* v. *California,* 386 U. S. 58.

[9] *E. g., Stanford* v. *Texas,* 379 U. S. 476, 481–485; *Marcus* v. *Search Warrant,* 367 U. S. 717, 724–729; *Frank* v. *Maryland,* 359 U. S. 360, 363–365.  See generally Lasson, The History and Development of the Fourth Amendment to the United States Constitution (1937); Landynski, Search and Seizure and the Supreme Court (1966).

tality, fruit, or contraband. A magistrate can intervene in both situations, and the requirements of probable cause and specificity can be preserved intact. Moreover, nothing in the nature of property seized as evidence renders it more private than property seized, for example, as an instrumentality; quite the opposite may be true. Indeed, the distinction is wholly irrational, since, depending on the circumstances, the same "papers and effects" may be "mere evidence" in one case and "instrumentality" in another. See Comment, 20 U. Chi. L. Rev. 319, 320–322 (1953).

In *Gouled* v. *United States,* 255 U. S. 298, 309, the Court said that search warrants "may not be used as a means of gaining access to a man's house or office and papers solely for the purpose of making search to secure evidence to be used against him in a criminal or penal proceeding . . . ." The Court derived from *Boyd* v. *United States, supra,* the proposition that warrants "may be resorted to only when a primary right to such search and seizure may be found in the interest which the public or the complainant may have in the property to be seized, or in the right to the possession of it, or when a valid exercise of the police power renders possession of the property by the accused unlawful and provides that it may be taken," 255 U. S., at 309; that is, when the property is an instrumentality or fruit of crime, or contraband. Since it was "impossible to say, on the record . . . that the Government had any interest" in the papers involved "other than as evidence against the accused . . . ," "to permit them to be used in evidence would be, in effect, as ruled in the *Boyd Case,* to compel the defendant to become a witness against himself." *Id.,* at 311.

The items of clothing involved in this case are not "testimonial" or "communicative" in nature, and their introduction therefore did not compel respondent to be-

come a witness against himself in violation of the Fifth Amendment. *Schmerber* v. *California,* 384 U. S. 757. This case thus does not require that we consider whether there are items of evidential value whose very nature precludes them from being the object of a reasonable search and seizure.

The Fourth Amendment ruling in *Gouled* was based upon the dual, related premises that historically the right to search for and seize property depended upon the assertion by the Government of a valid claim of superior interest, and that it was not enough that the purpose of the search and seizure was to obtain evidence to use in apprehending and convicting criminals. The common law of search and seizure after *Entick* v. *Carrington,* 19 How. St. Tr. 1029, reflected Lord Camden's view, derived no doubt from the political thought of his time, that the "great end, for which men entered into society, was to secure their property." *Id.,* at 1066. Warrants were "allowed only where the primary right to such a search and seizure is in the interest which the public or complainant may have in the property seized." Lasson, The History and Development of the Fourth Amendment to the United States Constitution 133–134. Thus stolen property—the fruits of crime—was always subject to seizure. And the power to search for stolen property was gradually extended to cover "any property which the private citizen was not permitted to possess," which included instrumentalities of crime (because of the early notion that items used in crime were forfeited to the State) and contraband. Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 475. No separate governmental interest in seizing evidence to apprehend and convict criminals was recognized; it was required that some property interest be asserted. The remedial structure also reflected these dual premises. Trespass, replevin, and the other means of

redress for persons aggrieved by searches and seizures, depended upon proof of a superior property interest. And since a lawful seizure presupposed a superior claim, it was inconceivable that a person could recover property lawfully seized. As Lord Camden pointed out in *Entick* v. *Carrington, supra,* at 1066, a general warrant enabled "the party's own property [to be] seized before and without conviction, and he has no power to reclaim his goods, even after his innocence is cleared by acquittal."

The premise that property interests control the right of the Government to search and seize has been discredited. Searches and seizures may be "unreasonable" within the Fourth Amendment even though the Government asserts a superior property interest at common law. We have recognized that the principal object of the Fourth Amendment is the protection of privacy rather than property, and have increasingly discarded fictional and procedural barriers rested on property concepts. See *Jones* v. *United States,* 362 U. S. 257, 266; *Silverman* v. *United States,* 365 U. S. 505, 511. This shift in emphasis from property to privacy has come about through a subtle interplay of substantive and procedural reform. The remedial structure at the time even of *Weeks* v. *United States,* 232 U. S. 383, was arguably explainable in property terms. The Court held in *Weeks* that a defendant could petition *before* trial for the return of his illegally seized property, a proposition not necessarily inconsistent with *Adams* v. *New York,* 192 U. S. 585, which held in effect that the property issues involved in search and seizure are collateral to a criminal proceeding.[10] The remedial structure finally escaped the bounds of common law property limitations in *Silverthorne*

---

[10] Both *Weeks* and *Adams* were written by Justice Day, and joined by several of the same Justices, including Justice Holmes.

*Lumber Co.* v. *United States,* 251 U. S. 385, and *Gouled* v. *United States, supra,* when it became established that suppression might be sought during a criminal trial, and under circumstances which would not sustain an action in trespass or replevin. Recognition that the role of the Fourth Amendment was to protect against invasions of privacy demanded a remedy to condemn the seizure in *Silverthorne,* although no possible common law claim existed for the return of the copies made by the Government of the papers it had seized. The remedy of suppression, necessarily involving only the limited, functional consequence of excluding the evidence from trial, satisfied that demand.

The development of search and seizure law since *Silverthorne* and *Gouled* is replete with examples of the transformation in substantive law brought about through the interaction of the felt need to protect privacy from unreasonable invasions and the flexibility in rulemaking made possible by the remedy of exclusion. We have held, for example, that intangible as well as tangible evidence may be suppressed, *Wong Sun* v. *United States,* 371 U. S. 471, 485–486, and that an actual trespass under local property law is unnecessary to support a remediable violation of the Fourth Amendment, *Silverman* v. *United States, supra.* In determining whether someone is a "person aggrieved by an unlawful search and seizure" we have refused "to import into the law . . . subtle distinctions, developed and refined by the common law in evolving the body of private property law which, more than almost any other branch of law, has been shaped by distinctions whose validity is largely historical." *Jones* v. *United States, supra,* 362 U. S., at 266. And with particular relevance here, we have given recognition to the interest in privacy despite the complete absence of a property claim by suppressing the very items which at

common law could be seized with impunity: stolen goods, *Henry* v. *United States,* 361 U. S. 98; instrumentalities, *Beck* v. *Ohio,* 379 U. S. 89; *McDonald* v. *United States, supra;* and contraband, *Trupiano* v. *United States,* 334 U. S. 699; *Aguilar* v. *Texas,* 378 U. S. 108.

The premise in *Gouled* that government may not seize evidence simply for the purpose of proving crime has likewise been discredited. The requirement that the Government assert in addition some property interest in material it seizes has long been a fiction,[11] obscuring the reality that government has an interest in solving crime. *Schmerber* settled the proposition that it is reasonable, within the terms of the Fourth Amendment, to conduct otherwise permissible searches for the purpose of obtaining evidence which would aid in apprehending and convicting criminals. The requirements of the Fourth Amendment can secure the same protection of privacy

---

[11] At common law the Government did assert a superior property interest when it searched lawfully for stolen property, since the procedure then followed made it necessary that the true owner swear that his goods had been taken. But no such procedure need be followed today; the Government may demonstrate probable cause and lawfully search for stolen property even though the true owner is unknown or unavailable to request and authorize the Government to assert his interest. As to instrumentalities, the Court in *Gouled* allowed their seizure, not because the Government had some property interest in them (under the ancient, fictitious forfeiture theory), but because they could be used to perpetrate further crime. 255 U. S., at 309. The same holds true, of course, for "mere evidence"; the prevention of crime is served at least as much by allowing the Government to identify and capture the criminal, as it is by allowing the seizure of his instrumentalities. Finally, contraband is indeed property in which the Government holds a superior interest, but only because the Government decides to vest such an interest in itself. And while there may be limits to what may be declared contraband, the concept is hardly more than a form through which the Government seeks to prevent and deter crime.

whether the search is for "mere evidence" or for fruits, instrumentalities or contraband. There must, of course, be a nexus—automatically provided in the case of fruits, instrumentalities or contraband—between the item to be seized and criminal behavior. Thus in the case of "mere evidence," probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction. In so doing, consideration of police purposes will be required. Cf. *Kremen* v. *United States,* 353 U. S. 346. But no such problem is presented in this case. The clothes found in the washing machine matched the description of those worn by the robber and the police therefore could reasonably believe that the items would aid in the identification of the culprit.

The remedy of suppression, moreover, which made possible protection of privacy from unreasonable searches without regard to proof of a superior property interest, likewise provides the procedural device necessary for allowing otherwise permissible searches and seizures conducted solely to obtain evidence of crime. For just as the suppression of evidence does not entail a declaration of superior property interest in the person aggrieved, thereby enabling him to suppress evidence unlawfully seized despite his inability to demonstrate such an interest (as with fruits, instrumentalities, contraband), the refusal to suppress evidence carries no declaration of superior property interest in the State, and should thereby enable the State to introduce evidence lawfully seized despite its inability to demonstrate such an interest. And, unlike the situation at common law, the owner of property would not be rendered remediless if "mere evidence" could lawfully be seized to prove crime. For just as the suppression of evidence does not in itself necessarily entitle the aggrieved person to its return (as, for example, contraband), the introduction of "mere evidence" does not in

itself entitle the State to its retention. Where public officials "unlawfully seize *or hold* a citizen's realty or chattels, recoverable by appropriate action at law or in equity . . . ," the true owner may "bring his possessory action to reclaim that which is wrongfully withheld." *Land* v. *Dollar,* 330 U. S. 731, 738. (Emphasis added.) See *Burdeau* v. *McDowell,* 256 U. S. 465, 474.

The survival of the *Gouled* distinction is attributable more to chance than considered judgment. Legislation has helped perpetuate it. Thus, Congress has never authorized the issuance of search warrants for the seizure of mere evidence of crime. See *Davis* v. *United States,* 328 U. S. 582, 606 (dissenting opinion of Mr. Justice Frankfurter). Even in the Espionage Act of 1917, where Congress for the first time granted general authority for the issuance of search warrants, the authority was limited to fruits of crime, instrumentalities, and certain contraband. 40 Stat. 228. *Gouled* concluded, needlessly it appears, that the Constitution virtually limited searches and seizures to these categories.[12] After *Gouled,* pressure

---

[12] *Gouled* was decided on certified questions. The only question which referred to the Espionage Act of 1917 stated: "Are papers of . . . evidential value . . . , when taken under search warrants issued pursuant to Act of June 15, 1917, from the house or office of the person so suspected,—seized and taken in violation of the 4th amendment?" *Gouled* v. *United States,* No. 250, Oct. Term, 1920, Certificate, p. 4. Thus the form in which the case was certified made it difficult if not impossible "to limit the decision to the sensible proposition of statutory construction, that Congress had not as yet authorized the seizure of purely evidentiary material." Chafee, *op. cit. supra,* at 699. The Government assumed the validity of petitioner's argument that *Entick* v. *Carrington, Boyd* v. *United States,* and other authorities established the constitutional illegality of seizures of private papers for use as evidence. *Gouled* v. *United States, supra,* Brief for the United States, p. 50. It argued, complaining of the absence of a record, that the papers introduced in evidence were instrumentalities of crime. The Court ruled that the

to test this conclusion was slow to mount. Rule 41 (b) of the Federal Rules of Criminal Procedure incorporated the *Gouled* categories as limitations on federal authorities to issue warrants, and *Mapp* v. *Ohio,* 367 U. S. 643, only recently made the "mere evidence" rule a problem in the state courts. Pressure against the rule in the federal courts has taken the form rather of broadening the categories of evidence subject to seizure, thereby creating considerable confusion in the law. See, *e. g.,* Note, 54 Geo. L. J. 593, 607–621 (1966).

The rationale most frequently suggested for the rule preventing the seizure of evidence is that "limitations upon the fruit to be gathered tend to limit the quest itself." *United States* v. *Poller,* 43 F. 2d 911, 914 (C. A. 2d Cir. 1930). But privacy "would be just as well served by a restriction on search to the even-numbered days of the month. . . . And it would have the extra advantage of avoiding hair-splitting questions . . . ." Kaplan, *op. cit. supra,* at 479. The "mere evidence" limitation has spawned exceptions so numerous and confusion so great, in fact, that it is questionable whether it affords meaningful protection. But if its rejection does enlarge the area of permissible searches, the intrusions are nevertheless made after fulfilling the probable cause and particularity requirements of the Fourth Amendment and after the intervention of "a neutral and detached magis-

record before it revealed no government interest in the papers other than as evidence against the accused. 255 U. S., at 311.

Significantly, *Entick* v. *Carrington* itself has not been read by the English courts as making unlawful the seizure of all papers for use as evidence. See *Dillon* v. *O'Brien,* 20 L. R. Ir. 300; *Elias* v. *Pasmore,* [1934] 2 K. B. 164. Although *Dillon,* decided in 1887, involved instrumentalities, the court did not rely on this fact, but rather on "the interest which the State has in a person guilty (or reasonably believed to be guilty) of a crime being brought to justice . . . ." 20 L. R. Ir., at 317.

trate . . . ." *Johnson v. United States,* 333 U. S. 10, 14. The Fourth Amendment allows intrusions upon privacy under these circumstances, and there is no viable reason to distinguish intrusions to secure "mere evidence" from intrusions to secure fruits, instrumentalities, or contraband.

The judgment of the Court of Appeals is

*Reversed.*

MR. JUSTICE BLACK concurs in the result.

MR. JUSTICE FORTAS, with whom THE CHIEF JUSTICE joins, concurring.

While I agree that the Fourth Amendment should not be held to require exclusion from evidence of the clothing as well as the weapons and ammunition found by the officers during the search, I cannot join in the majority's broad—and in my judgment, totally unnecessary—repudiation of the so-called "mere evidence" rule.

Our Constitution envisions that searches will ordinarily follow procurement by police of a valid search warrant. Such warrants are to issue only on probable cause, and must describe with particularity the persons or things to be seized. There are exceptions to this rule. Searches may be made incident to a lawful arrest, and—as today's decision indicates—in the course of "hot pursuit." But searches under each of these exceptions have, until today, been confined to those essential to fulfill the purpose of the exception: that is, we have refused to permit use of articles the seizure of which could not be strictly tied to and justified by the exigencies which excused the warrantless search. The use in evidence of weapons seized in a "hot pursuit" search or search incident to arrest satisfies this criterion because of the need to protect the arresting officers from weapons to which the suspect might resort. The search for and seizure of fruits are, of course, justifiable on independent grounds: The fruits

are an object of the pursuit or arrest of the suspect, and should be restored to their true owner. The seizure of contraband has been justified on the ground that the suspect has not even a bare possessory right to contraband. See, *e. g., Boyd* v. *United States,* 116 U. S. 616, 623–624 (1886); *United States* v. *Kirschenblatt,* 16 F. 2d 202, 203 (C. A. 2d Cir. 1926) (L. Hand, J.).

Similarly, we have forbidden the use of articles seized in such a search unless obtained from the person of the suspect or from the immediate vicinity. Since a warrantless search is justified only as incident to an arrest or "hot pursuit," this Court and others have held that its scope does not include permission to search the entire building in which the arrest occurs, or to rummage through locked drawers and closets, or to search at another time or place. *James* v. *Louisiana,* 382 U. S. 36 (1965); *Stoner* v. *California,* 376 U. S. 483, 486–487 (1964); *Preston* v. *United States,* 376 U. S. 364, 367 (1964); *United States* v. *Lefkowitz,* 285 U. S. 452 (1932); *Go-Bart Co.* v. *United States,* 282 U. S. 344, 358 (1931); *Agnello* v. *United States,* 269 U. S. 20, 30–31 (1925); *United States* v. *Kirschenblatt, supra.*[1]

In the present case, the articles of clothing admitted into evidence are not within any of the traditional categories which describe what materials may be seized, either with or without a warrant. The restrictiveness of these categories has been subjected to telling criticism,[2] and

---

[1] It is true that this Court has not always been as vigilant as it should to enforce these traditional and extremely important restrictions upon the scope of such searches. See *United States* v. *Rabinowitz,* 339 U. S. 56, 68–86 (1950) (Frankfurter, J., dissenting); *Harris* v. *United States,* 331 U. S. 145, 155–198 (1947) (dissenting opinions).

[2] See, *e. g., People* v. *Thayer,* 63 Cal. 2d 635, 408 P. 2d 108 (1965) (Traynor, C. J.), cert. denied, 384 U. S. 908 (1966); Kaplan, Search and Seizure: A No-Man's Land in the Criminal Law, 49 Calif. L. Rev. 474, 478 (1961).

although I believe that we should approach expansion of these categories with the diffidence which their imposing provenance commands, I agree that the use of identifying clothing worn in the commission of a crime and seized during "hot pursuit" is within the spirit and intendment of the "hot pursuit" exception to the search-warrant requirement. That is because the clothing is pertinent to identification of the person hotly pursued as being, in fact, the person whose pursuit was justified by connection with the crime. I would frankly place the ruling on that basis. I would not drive an enormous and dangerous hole in the Fourth Amendment to accommodate a specific and, I think, reasonable exception.

As my Brother DOUGLAS notes, *post,* opposition to general searches is a fundamental of our heritage and of the history of Anglo-Saxon legal principles. Such searches, pursuant to "writs of assistance," were one of the matters over which the American Revolution was fought. The very purpose of the Fourth Amendment was to outlaw such searches, which the Court today sanctions. I fear that in gratuitously striking down the "mere evidence" rule, which distinguished members of this Court have acknowledged as essential to enforce the Fourth Amendment's prohibition against general searches, the Court today needlessly destroys, root and branch, a basic part of liberty's heritage.

MR. JUSTICE DOUGLAS, dissenting.

We start with the Fourth Amendment which provides:

"The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated, and no Warrants shall issue, but upon probable cause, supported by Oath or affirmation, and particularly describing the place to be searched, and the persons or things to be seized."

This constitutional guarantee, now as applicable to the States (*Mapp* v. *Ohio*, 367 U. S. 643) as to the Federal Government, has been thought, until today, to have two faces of privacy:

(1) One creates a zone of privacy that may not be invaded by the police through raids, by the legislators through laws, or by magistrates through the issuance of warrants.

(2) A second creates a zone of privacy that may be invaded either by the police in hot pursuit or by a search incident to arrest or by a warrant issued by a magistrate on a showing of probable cause.

The *first* has been recognized from early days in Anglo-American law. Search warrants, for seizure of stolen property, though having an ancient lineage, were criticized even by Coke. Institutes Bk. 4, pp. 176–177.

As stated by Lord Camden in *Entick* v. *Carrington,* 19 How. St. Tr. 1029, 1067, even warrants authorizing seizure of stolen goods were looked upon with disfavor but "crept into the law by imperceptible practice." By the time of Charles II they had burst their original bounds and were used by the Star Chamber to find evidence among the files and papers of political suspects. Thus in the trial of Algernon Sidney in 1683 for treason "papers, which were said to be found in my [Sidney's] house, were produced as another witness" (9 How. St. Tr. 818, 901) and the defendant was executed. *Id.,* at 906–907. From this use of papers as evidence there grew up the practice of the Star Chamber empowering a person "to search in all places, where books were printing, in order to see if the printer had a licence; and if upon such search he found any books which he suspected to be libellous against the church or state, he was to seize them, and carry them before the proper magistrate." *Entick* v. *Carrington, supra,* at 1069. Thus the general warrant became a powerful instrument

in proceedings for seditious libel against printers and authors. *Ibid.* John Wilkes led the campaign against the general warrant. *Boyd* v. *United States,* 116 U. S. 616, 625. Wilkes won (*Entick* v. *Carrington, supra,* decided in 1765); and Lord Camden's opinion not only outlawed the general warrant (*id.,* at 1072) but went on to condemn searches "for evidence" with or without a general warrant:

"There is no process against papers in civil causes. It has been often tried, but never prevailed. Nay, where the adversary has by force or fraud got possession of your own proper evidence, there is no way to get it back but by action.

"In the criminal law such a proceeding was never heard of; and yet there are some crimes, such for instance as murder, rape, robbery, and housebreaking, to say nothing of forgery and perjury, that are more atrocious than libelling. But our law has provided no paper-search in these cases to help forward the conviction.

"Whether this procedeth from the gentleness of the law towards criminals, or from a consideration that such a power would be more pernicious to the innocent than useful to the public, I will not say.

"It is very certain, that the law obligeth no man to accuse himself; because the necessary means of compelling self-accusation, falling upon the innocent as well as the guilty, would be both cruel and unjust; and it should seem, that search for evidence is disallowed upon the same principle. There too the innocent would be confounded with the guilty." *Id.,* at 1073.

Thus Lord Camden decided two things: (1) that searches for evidence violated the principle against self-incrimination; (2) that general warrants were void.

This decision, in the very forefront when the Fourth Amendment was adopted, underlines the construction that it covers something other than the form of the warrant [1] and creates a zone of privacy which no government official may enter.

The complaint of Bostonians, while including the general warrants, went to the point of police invasions of personal sanctuaries:

> " 'A List of Infringements and Violations of Rights' drawn up by the Boston town meeting late in 1772 alluded to a number of personal rights which had allegedly been violated by agents of the crown. The list included complaints against the writs of assistance which had been employed by royal officers in their searches for contraband. The Bostonians complained that 'our houses and even our bed chambers are exposed to be ransacked, our boxes, chests, and trunks broke open, ravaged and plundered by wretches, whom no prudent man would venture to employ even as menial servants.' " Rutland, The Birth of the Bill of Rights 25 (1955).

The debates concerning the Bill of Rights did not focus on the precise point with which we here deal. There was much talk about the general warrants and the fear of them. But there was also some reference to the sanctity of one's home and his personal belongings, even

---

[1] The Virginia Declaration of Rights, June 12, 1776, in its Article 10 proclaimed only against "general warrants." See Rutland, The Birth of the Bill of Rights 232 (1955). And the definition of the general warrant included not only a license to search for everything in a named place but to search all and any places in the discretion of the officers. *Frisbie* v. *Butler*, 1 Kirby 213 (Conn.). See generally Quincy's Mass. Rep. 1761–1772 Appendix I for the forms of these writs.

including the clothes he wore. Thus in Virginia, Patrick Henry said:

> "The officers of Congress may come upon you now, fortified with all the terrors of paramount federal authority. Excisemen may come in multitudes; for the limitation of their numbers no man knows. They may, unless the general government be restrained by a bill of rights, or some similar restriction, go into your cellars and rooms, and search, ransack, and measure, every thing you eat, drink, and wear. They ought to be restrained within proper bounds." 3 Elliot's Debates 448–449.

This indicates that the Fourth Amendment has the dual aspect that I have mentioned. Certainly the debates nowhere suggest that it was concerned only with regulating the form of warrants.

This is borne out by what happened in the Congress. In the House the original draft read as follows:

> "The right of the people to be secured in their persons, houses, papers, and effects, shall not be violated by warrants issuing without probable cause, supported by oath or affirmation, and not particularly describing the place to be searched and the persons or things to be seized." 1 Annals of Cong. 754.

That was amended to read "The right of the people to be secure in their persons, houses, papers, and effects, against unreasonable seizures and searches," etc. *Ibid.* Mr. Benson, Chairman of a Committee of Three to arrange the amendments, objected to the words "by warrants issuing" and proposed to alter the amendment so as to read "and no warrant shall issue." *Ibid.* But Benson's amendment was defeated. *Ibid.* And if the

story had ended there, it would be clear that the Fourth Amendment touched only the form of the warrants and the manner of their issuance. But when the Benson Committee later reported the Fourth Amendment to the House, it was in the form he had earlier proposed and was then accepted. 1 Annals of Cong. 779. The Senate agreed. Senate Journal August 25, 1789.

Thus it is clear that the Fourth Amendment has two faces of privacy, a conclusion emphasized by Lasson, The History and Development of the Fourth Amendment to the United States Constitution 103 (1937):

> "As reported by the Committee of Eleven and corrected by Gerry, the Amendment was a one-barrelled affair, directed apparently only to the essentials of a valid warrant. The general principle of freedom from unreasonable search and seizure seems to have been stated only by way of premise, and the positive inhibition upon action by the Federal Government limited consequently to the issuance of warrants without probable cause, etc. That Benson interpreted it in this light is shown by his argument that although the clause was good as far as it went, *it was not sufficient,* and by the change which he advocated to obviate this objection. The provision as he proposed it contained *two* clauses. The general right of security from unreasonable search and seizure was given a sanction of its own and the amendment thus intentionally given a broader scope. That the prohibition against 'unreasonable searches' was intended, accordingly, to cover something other than the form of the warrant is a question no longer left to implication to be derived from the phraseology of the Amendment."

Lord Camden's twofold classification of zones of privacy was said by Cooley to be reflected in the Fourth Amendment:

"The warrant is not allowed for the purpose of obtaining evidence of an intended crime; but only after lawful evidence of an offence actually committed. Nor even then is it allowable to invade one's privacy for the sole purpose of obtaining evidence against him, except in a few special cases where that which is the subject of the crime is supposed to be concealed, and the public or the complainant has an interest in it or in its destruction." Constitutional Limitations 431–432 (7th ed. 1903).

And that was the holding of the Court in *Boyd* v. *United States,* 116 U. S. 616, decided in 1886. Mr. Justice Bradley reviewed British history, including *Entick* v. *Carrington, supra,* and American history under the Bill of Rights and said:

"The search for and seizure of stolen or forfeited goods, or goods liable to duties and concealed to avoid the payment thereof, are totally different things from a search for and seizure of a man's private books and papers for the purpose of obtaining information therein contained, or of using them as evidence against him. The two things differ *toto coelo.* In the one case, the government is entitled to the possession of the property; in the other it is not." *Id.,* at 623.

What Mr. Justice Bradley said about stolen or forfeited goods or contraband is, of course, not accurate if read to mean that they may be seized at any time even without a warrant or not incident to an arrest that is lawful. The right to seize contraband is not absolute. If the search leading to discovery of an illicit article is

not incidental to a lawful arrest or not authorized by a search warrant, the fact that contraband is discovered does not make the seizure constitutional. *Trupiano* v. *United States,* 334 U. S. 699, 705; *McDonald* v. *United States,* 335 U. S. 451; *Henry* v. *United States,* 361 U. S. 98, 103; *Beck* v. *Ohio,* 379 U. S. 89; *Aguilar* v. *Texas,* 378 U. S. 108.

That is not our question. Our question is whether the Government, though armed with a proper search warrant or though making a search incident to an arrest, may seize, and use at the trial, testimonial evidence, whether it would otherwise be barred by the Fifth Amendment or would be free from such strictures. The teaching of *Boyd* is that such evidence, though seized pursuant to a lawful search, is inadmissible.

That doctrine had its full flowering in *Gouled* v. *United States,* 255 U. S. 298, where an opinion was written by Mr. Justice Clarke for a unanimous Court that included both Mr. Justice Holmes and Mr. Justice Brandeis. The prosecution was for defrauding the Government under procurement contracts. Documents were taken from defendant's business office under a search warrant and used at the trial as evidence against him. Stolen or forged papers could be so seized, the Court said; so could lottery tickets; so could contraband; so could property in which the public had an interest, for reasons tracing back to warrants allowing the seizure of stolen property. But the papers or documents fell in none of those categories and the Court therefore held that even though they had been taken under a warrant, they were inadmissible at the trial as not even a warrant, though otherwise proper and regular, could be used "for the purpose of making search to secure evidence" of a crime. *Id.,* at 309. The use of those documents against the accused might, of course, violate the Fifth Amendment. *Id.,* at 311. But whatever may be the intrinsic nature of the evidence,

the owner is then "the unwilling source of the evidence" (*id.*, at 306), there being no difference so far as the Fifth Amendment is concerned "whether he be obliged to supply evidence against himself or whether such evidence be obtained by an illegal search of his premises and seizure of his private papers." *Ibid.*

We have, to be sure, breached that barrier, *Schmerber* v. *California,* 384 U. S. 757, being a conspicuous example. But I dissented then and renew my opposing view at this time. That which is taken from a person without his consent and used as testimonial evidence violates the Fifth Amendment.

That was the holding in *Gouled;* and that was the line of authority followed by Judge Simon Sobeloff, writing for the Court of Appeals for reversal in this case. 363 F. 2d 647. As he said, even if we assume that the search was lawful, the articles of clothing seized were of evidential value only and under *Gouled* could not be used at the trial against petitioner. As he said, the Fourth Amendment guarantees the right of the people to be secure "in their persons, houses, papers, and effects, against unreasonable searches and seizures." Articles of clothing are covered as well as papers. Articles of clothing may be of evidential value as much as documents or papers.

Judge Learned Hand stated a part of the philosophy of the Fourth Amendment in *United States* v. *Poller,* 43 F. 2d 911, 914:

> "[I]t is only fair to observe that the real evil aimed at by the Fourth Amendment is the search itself, that invasion of a man's privacy which consists in rummaging about among his effects to secure evidence against him. If the search is permitted at all, perhaps it does not make so much difference what is taken away, since the officers will ordinarily

not be interested in what does not incriminate, and there can be no sound policy in protecting what does. Nevertheless, limitations upon the fruit to be gathered tend to limit the quest itself . . . ."

The right of privacy protected by the Fourth Amendment relates in part of course to the precincts of the home or the office. But it does not make them sanctuaries where the law can never reach. There are such places in the world. A mosque in Fez, Morocco, that I have visited, is by custom a sanctuary where any refugee may hide, safe from police intrusion. We have no such sanctuaries here. A policeman in "hot pursuit" or an officer with a search warrant can enter any house, any room, any building, any office. The privacy of those *places* is of course protected against invasion except in limited situations. The full privacy protected by the Fourth Amendment is, however, reached when we come to books, pamphlets, papers, letters, documents, and other personal effects. Unless they are contraband or instruments of the crime, they may not be reached by any warrant nor may they be lawfully seized by the police who are in "hot pursuit." By reason of the Fourth Amendment the police may not rummage around among these personal effects, no matter how formally perfect their authority may appear to be. They may not seize them. If they do, those articles may not be used in evidence. Any invasion whatsoever of those personal effects is "unreasonable" within the meaning of the Fourth Amendment. That is the teaching of *Entick* v. *Carrington, Boyd* v. *United States,* and *Gouled* v. *United States.*

Some seek to explain *Entick* v. *Carrington* on the ground that it dealt with seditious libel and that any search for political tracts or letters under our Bill of Rights would be unlawful *per se* because of the First

Amendment and therefore "unreasonable" under the Fourth. That argument misses the main point. A prosecution for seditious libel would of course be unconstitutional under the First Amendment because it bars laws "abridging the freedom of speech, or of the press." The First Amendment also has a penumbra, for while it protects only "speech" and "press" it also protects related rights such as the right of association. See *NAACP* v. *Alabama,* 357 U. S. 449, 460, 462; *Bates* v. *Little Rock,* 361 U. S. 516, 523; *Shelton* v. *Tucker,* 364 U. S. 479, 486; *Louisiana* v. *NAACP,* 366 U. S. 293, 296; and *NAACP* v. *Button,* 371 U. S. 415, 430–431. So it could be held, quite apart from the Fourth Amendment, that any probing into the area of opinions and beliefs would be barred by the First Amendment. That is the essence of what we said in *Watkins* v. *United States,* 354 U. S. 178, 197:

> "Clearly, an investigation is subject to the command that the Congress shall make no law abridging freedom of speech or press or assembly. While it is true that there is no statute to be reviewed, and that an investigation is not a law, nevertheless an investigation is part of lawmaking. It is justified solely as an adjunct to the legislative process. The First Amendment may be invoked against infringement of the protected freedoms by law or by lawmaking."

But the privacy protected by the Fourth Amendment is much wider than the one protected by the First. *Boyd* v. *United States* was a forfeiture proceeding under the customs revenue law and the paper held to be beyond the reach of the Fourth Amendment was an invoice covering the imported goods. 116 U. S., at 617–619, 638. And as noted, *Gouled* v. *United States* involved a prosecution for defrauding the Government under procurement contracts and the papers held protected against

seizure, even under a technically proper warrant, were (1) an unexecuted form of contract between defendant and another person; (2) a written contract signed by defendant and another person; and (3) a bill for disbursement and professional services rendered by the attorney to the defendant. 255 U. S., at 306–307.

The constitutional philosophy is, I think, clear. The personal effects and possessions of the individual (all contraband and the like excepted) are sacrosanct from prying eyes, from the long arm of the law, from any rummaging by police. Privacy involves the choice of the individual to disclose or to reveal what he believes, what he thinks, what he possesses. The article may be a nondescript work of art, a manuscript of a book, a personal account book, a diary, invoices, personal clothing, jewelry, or whatnot. Those who wrote the Bill of Rights believed that every individual needs both to communicate with others and to keep his affairs to himself. That dual aspect of privacy means that the individual should have the freedom to select for himself the time and circumstances when he will share his secrets with others and decide the extent of that sharing.[2] This is his preroga-

[2] This concept of the right of privacy protected by the Fourth Amendment is mirrored in the cases involving collateral aspects of the problem presented in this case:

"It has, similarly, been held that a defendant cannot complain of the seizure of books and papers neither his own, nor in his possession. It is also the well-settled rule that where the papers are public records the defendant's custody will not avail him against their seizure. Where papers are taken out of the custody of one not their owner, it seems that such person can object if there has been no warrant, or if the warrant was directed to him, but not if the warrant is directed to the owner. If the defendant's property is lawfully out of his possession it makes no difference by what means it comes into the Government's hands as there has been no compulsion exercised upon him. But the privilege extends to letters in the mails. The privilege extends to the office as well as the home.

"On the other hand, to enable a person to claim the privilege,

tive not the States'. The Framers, who were as knowledgeable as we, knew what police surveillance meant and how the practice of rummaging through one's personal effects could destroy freedom.

It was in that tradition that we held in *Griswold* v. *Connecticut,* 381 U. S. 479, that lawmakers could not, as respects husband and wife at least, make the use of contraceptives a crime. We spoke of the pronouncement in *Boyd* v. *United States* that the Fourth and Fifth Amendments protected the person against all governmental invasions "of the sanctity of a man's home and the privacies of life." 116 U. S., at 630. We spoke of the "right to privacy" of the Fourth Amendment upheld by *Mapp* v. *Ohio,* 367 U. S. 643, 656, and of the many other controversies "over these penumbral rights of 'privacy and repose.'" 381 U. S., at 485. And we added:

> "Would we allow the police to search the sacred precincts of marital bedrooms for telltale signs of the use of contraceptives? The very idea is repulsive to the notions of privacy surrounding the marriage relationship.
>
> "We deal with a right of privacy older than the Bill of Rights—older than our political parties, older than our school system. Marriage is a coming together for better or for worse, hopefully enduring, and intimate to the degree of being sacred. It is an association that promotes a way of life, not causes; a harmony in living, not political faiths; a bilateral

---

it is not necessary that he be a party to any pending criminal proceeding. He can object to the illegal seizure of his own property and resist a forcible production of it even if he is only called as a witness.

"Nor must a person be a citizen to be entitled to the protection of the Fourth Amendment. . . ." Fraenkel, Concerning Searches and Seizures, 34 Harv. L. Rev. 361, 375–376.

loyalty, not commercial or social projects. Yet it is an association for as noble a purpose as any involved in our prior decisions." *Id.,* at 485–486.

This right of privacy, sustained in *Griswold,* is kin to the right of privacy created by the Fourth Amendment. That there is a zone that no police can enter—whether in "hot pursuit" or armed with a meticulously proper warrant—has been emphasized by *Boyd* and by *Gouled.* They have been consistently and continuously approved.[3] I would adhere to them and leave with the individual the choice of opening his private effects (apart from contraband and the like) to the police or keeping their contents a secret and their integrity inviolate. The existence of that choice is the very essence of the right of privacy. Without it the Fourth Amendment and the Fifth are ready instruments for the police state that the Framers sought to avoid.

---

[3] See, *e. g., Carroll* v. *United States,* 267 U. S. 132, 149–150; *United States* v. *Lefkowitz,* 285 U. S. 452, 464–466; *Davis* v. *United States,* 328 U. S. 582, 590, n. 11; *Harris* v. *United States,* 331 U. S. 145, 154; *United States* v. *Rabinowitz,* 339 U. S. 56, 64, n. 6; *Abel* v. *United States,* 362 U. S. 217, 234–235.