**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS FOR THE NINTH CIRCUIT

| | |
|---|---|
| DANIEL BILL; BRYAN HANANIA; MICHAEL MALPASS, *Plaintiffs-Appellants*, <br><br> v. <br><br> WARREN BREWER; HEATHER POLOMBO, *Defendants-Appellees*. | No. 13-15844 <br><br> D.C. No. 2:12-cv-02613-SRB <br><br><br> OPINION |

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
June 9, 2015—San Francisco, California

Filed August 31, 2015

Before: Barry G. Silverman, Ronald M. Gould,
and Andrew D. Hurwitz, Circuit Judges.

Opinion by Judge Hurwitz

# SUMMARY[*]

## Civil Rights

The panel affirmed the district court's dismissal of an action brought by three Phoenix police officers who alleged that two other officers violated the Fourth and Fourteenth Amendments when, pursuant to a state court order, they obtained DNA samples from the plaintiffs to exclude them as contributors of DNA at a crime scene.

The panel held that the superior court orders authorizing the collection of plaintiffs' DNA satisfied the Warrant Clause of the Fourth Amendment. The panel further held that it was not unreasonable, under the circumstances, to ask sworn officers to provide saliva samples for the sole purpose of demonstrating that the DNA left at a crime scene was not the result of inadvertent contamination by on-duty public safety personnel.

## COUNSEL

Paul J. Orfanedes, Michael Bekesha (argued), Judicial Watch, Inc., Washington, D.C., for Plaintiffs-Appellants.

Gary Verburg, City Attorney, Robert A. Hyde (argued), Assistant City Attorney, Office of the City Attorney, Phoenix, Arizona, for Defendants-Appellees.

---

[*] This summary constitutes no part of the opinion of the court. It has been prepared by court staff for the convenience of the reader.

# OPINION

HURWITZ, Circuit Judge:

In this 42 U.S.C. § 1983 action, three Phoenix police officers allege that two other officers violated the Fourth and Fourteenth Amendments when, pursuant to a state court order, they obtained DNA samples from the plaintiffs to exclude them as contributors of DNA at a crime scene. The district court dismissed the complaint, and we affirm.

## I.

### A.

On October 18, 2010, Phoenix Police Sergeant Sean Drenth died from a gunshot wound to his head. His body was found in the northwest corner of an empty lot near the Arizona State Capitol; a shotgun was across his chest and a second weapon by his ankle. Sergeant Drenth's patrol car was in the center of the lot, and his service weapon was found just beyond the south side of the lot. More than 300 public safety personnel, the chief of police, and the mayor quickly converged on the scene. Roughly 100 people entered the area where Sergeant Drenth's body was discovered, including the three plaintiffs, who were assigned to canine search teams.

The police investigators assigned to the case initially attempted to determine whether Sergeant Drenth's death was a homicide staged to look like a suicide or a suicide staged to look like a homicide. Detective Warren Brewer led the investigation with the assistance of Detective Heather Polombo. That investigation revealed unknown male DNA profiles on Drenth's patrol car and weapons. Over the ensuing months, Polombo received consent to collect DNA samples from more than 100 individuals who had entered the crime scene in order to eliminate them as contributors of the

unknown DNA. Each of the approximately fifty Phoenix Police Department officers who entered the crime scene consented to give samples, with the exception of the three plaintiffs and two others.

Polombo met with the five non-consenting officers in April 2011. She told them that they had been excluded as suspects in any crime because "their portable radios and the mobile digital communicators in their vehicles confirmed their locations on the night of" Drenth's death, and she again requested DNA samples to exclude them as contributors of the questioned DNA. Polombo provided each officer with a police department "DNA Collection Fact Sheet – Drenth Investigation" (the "DNA Memo"), explaining that their DNA samples would be used only for this limited purpose, and would "not be entered into [the Combined DNA Index System ("CODIS")]"[1] or used to identify DNA found at future crime scenes.

## B.

The five officers nonetheless continued to refuse to provide DNA samples. Brewer and Polombo then sought court orders pursuant to Arizona Revised Statutes § 13-3905[2] to obtain buccal swabs—a Q-tip swab along the inside

---

[1] CODIS is a "centrally-managed database linking DNA profiles culled from federal, state, and territorial DNA collection programs, as well as profiles drawn from crime-scene evidence, unidentified remains, and genetic samples voluntarily provided by relatives of missing persons." *United States v. Kincade*, 379 F.3d 813, 819 (9th Cir. 2004) (en banc).

[2] Arizona Revised Statutes § 13-3905 provides, in relevant part:

**A.** A peace officer who is engaged, within the scope of the officer's authority, in the investigation of a felony may make written application upon oath or affirmation to a magistrate for an order authorizing the temporary detention, for the purpose of obtaining evidence of identifying physical characteristics, of an identified or particularly described individual residing in or found in the jurisdiction over which the magistrate presides. The order shall require the presence of the identified or particularly described individual at such time and place as the court shall direct for obtaining the identifying physical characteristic evidence. The magistrate may issue the order on a showing of all of the following:

1. Reasonable cause for belief that a felony has been committed.

2. Procurement of evidence of identifying physical characteristics from an identified or particularly described individual may contribute to the identification of the individual who committed such offense.

3. The evidence cannot otherwise be obtained by the investigating officer from either the law enforcement agency employing the affiant or the department of public safety.

\*\*\*

**G.** For the purposes of this section, "identifying physical characteristics" includes, but is not limited to, the fingerprints, palm prints, footprints, measurements, handwriting, handprinting, sound of voice, blood samples, urine samples, saliva samples, hair samples, comparative personal appearance or photographs of an individual.

of the five officers' cheeks—for DNA testing.  In support of the applications for the orders, Brewer submitted affidavits describing the five officers' presence at the crime scene, noting their "potential to [have] inadvertently deposit[ed] their DNA on the collected evidence," and avowing that the DNA samples "may contribute to the identification of the individual who committed" the homicide.

A superior court judge issued the orders, and buccal swabs were taken from the five officers.  The samples were analyzed and the results included in investigative reports along with the results of analysis of swabs taken from others at the scene.  The swabs are currently impounded by the Department pursuant to Arizona Revised Statutes § 13-4221.[3]  The Department has repeatedly stated that none of the officers is suspected of having committed any crime.

## C.

On December 7, 2012, plaintiffs filed this 42 U.S.C. § 1983 action, claiming that Brewer and Polombo violated the Fourth Amendment by obtaining, analyzing, and retaining plaintiffs' DNA.   The complaint sought (1) nominal damages of $1.00 for each plaintiff; (2) a declaration that the seizure of the DNA was unlawful; and

---

[3] Arizona Revised Statutes § 13-4221(A) provides that DNA samples collected in connection with a homicide must be retained for "[t]he period of time that a person who was convicted" of the offense "remains incarcerated for that offense or until the completion of the person's supervised release," or, for cold cases, "fifty-five years or until a person is convicted of the crime and remains incarcerated or under supervised release for that offense."   The statute gives government entities "discretion concerning the conditions under which biological evidence is retained, preserved or transferred among different entities." *Id.* § 13-4221(F).

(3) injunctive relief precluding defendants "from continuing to maintain possession, custody, or control" of the DNA samples and ordering them to destroy "samples and any analyses and reports of Plaintiffs' DNA samples."

The district court dismissed the complaint for failure to state a claim. This appeal timely followed. We have jurisdiction under 28 U.S.C. § 1291. "We review *de novo* the district court's granting of a motion to dismiss for failure to state a claim," *Weiland v. Am. Airlines, Inc.*, 778 F.3d 1112, 1114 (9th Cir. 2015), and "accept as true the factual allegations in [the] complaint," *Ashcroft v. al-Kidd*, 131 S. Ct. 2074, 2079 (2011). "We may affirm the district court on any basis supported by the record." *Gonzalez v. Planned Parenthood of L.A.*, 759 F.3d 1112, 1114 n.1 (9th Cir. 2014).

## II.

The Supreme Court has held that "using a buccal swab on the inner tissues of a person's cheek in order to obtain DNA samples is a search" under the Fourth Amendment. *Maryland v. King*, 133 S. Ct. 1958, 1968-69 (2013); *see also Missouri v. McNeely*, 133 S. Ct. 1552, 1565 (2013) ("[A]ny compelled intrusion into the human body implicates significant, constitutionally protected privacy interests."). Thus, the issue before us is whether the defendants "respected relevant Fourth Amendment standards" in collecting plaintiffs' DNA. *Schmerber v. California*, 384 U.S. 757, 768 (1966). Plaintiffs' briefs argue that because defendants "fail[ed] to obtain search warrants before taking DNA samples" and had no "individualized suspicion that Plaintiffs had committed criminal wrongdoing," collection of their DNA violated the Fourth Amendment because it does not fall within any of the "established exceptions" to

the warrant requirement.**[4]**  We disagree.  The superior court orders authorizing the collection of the DNA samples fully satisfied the warrant requirement of the Fourth Amendment.

## A.

"Ordinarily, the reasonableness of a search depends on governmental compliance with the Warrant Clause, which requires authorities to demonstrate probable cause to a neutral magistrate and thereby convince him to provide formal authorization to proceed with a search by issuance of a particularized warrant."  *United States v. Kincade*, 379 F.3d 813, 822 (9th Cir. 2004) (en banc).  The orders issued by the superior court pursuant to Arizona Revised Statutes § 13-3905 were not formally denominated as search warrants.  Moreover, the state statute requires a showing of only reasonable cause "for belief that a felony has been committed" to support a detention order, *id.*, § 13-3905(A)(1)—something the Arizona Supreme Court has defined as "less than probable cause," *State v. Rodriguez*, 921 P.2d 643, 651 (Ariz. 1996)—and specifies no particular quantum of suspicion that the evidence sought "may contribute to the identification of the individual who committed such offense," § 13-3905(A)(2).

However, when considering Fourth Amendment challenges to evidence seized pursuant to § 13-3905 orders, the Arizona Supreme Court has described such orders as

---

**[4]** On appeal, plaintiffs have not developed the arguments made below that continued possession of their DNA violates the Fourth Amendment and that the defendants omitted material information from the applications to the superior court.  Thus, these arguments are forfeited. *See Carmickle v. Comm'r, Soc. Sec. Admin.*, 533 F.3d 1155, 1161 n.2 (9th Cir. 2008) (declining to address argument because it was not argued "with any specificity" on appeal).

"warrants." *State v. Jones*, 49 P.3d 273, 280 (Ariz. 2002). That court has also stated that "probable cause is the standard that must be met" for a § 13-3905 order involving a "bodily invasion" constituting "a search under the Fourth Amendment." *Id.* at 281; *see also State v. Wedding*, 831 P.2d 398, 404 (Ariz. Ct. App. 1992) ("The affidavit [supporting a § 13-3905 order for saliva and blood samples] clearly supports the . . . finding that there was probable cause to search and seize the defendant at the time of the detention."). Thus, we analyze the § 13-3905 orders in this case, notwithstanding the more limited language of the statute, for compliance with the Warrant Clause of the Fourth Amendment.

The "precise and clear" words of the Fourth Amendment "require only three things" for a valid search warrant:

> First, warrants must be issued by neutral, disinterested magistrates. Second, those seeking the warrant must demonstrate to the magistrate their probable cause to believe that the evidence sought will aid in a particular apprehension or conviction for a particular offense. Finally, warrants must particularly describe the things to be seized, as well as the place to be searched.

*Dalia v. United States*, 441 U.S. 238, 255 (1979) (citations and internal quotation marks omitted). There can be no contest that the orders here satisfied the first and third requirements: they were issued by a superior court judge and described a "saliva sample" to be seized "by mouth swab" from the person of the plaintiffs. Whether the orders satisfy the Warrant Clause therefore turns on whether the submitted affidavits demonstrated probable cause to believe that the

evidence sought would aid in an apprehension or conviction for a particular offense.

To be sure, the orders here did not seek to obtain evidence that the plaintiffs committed a crime.  But contrary to plaintiffs' intimations, "[t]he critical element in a reasonable search is not that the owner of the property," or in this case the person, to be searched "is suspected of crime."  *Zurcher v. Stanford Daily*, 436 U.S. 547, 556 (1978).  Rather, "probable cause to search . . . concerns the connection of the items sought with crime and the present location of the items." *United States v. O'Connor*, 658 F.2d 688, 693 n.7 (9th Cir. 1981).  Of course, law enforcement must demonstrate "a nexus . . . between the item to be seized and criminal behavior."  *Warden, Md. Penitentiary v. Hayden*, 387 U.S. 294, 307 (1967).  "[I]n the case of 'mere evidence,' probable cause" for such a nexus "must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id.*

These constitutional requirements were satisfied here. The superior court expressly found "probable cause to believe that the crime of Homicide had been committed." Plaintiffs wisely do not challenge this finding; indeed, the affidavits detailed the date, time, victim, and crime scene of the highly publicized death being investigated.  The affidavits also explained that DNA samples were sought from all public safety personnel who entered the crime scene to exclude them as depositors of the questioned DNA.  It cannot be meaningfully debated that there was probable cause to believe the evidence sought could be found in the place to be searched (inside of plaintiffs' mouths).  *See Illinois v. Gates*, 462 U.S. 213, 230 (1983) (explaining that probable cause is a "commonsense, practical question").

Moreover, the affidavits plainly demonstrated "a nexus" between the crime under investigation and the evidence sought. *Warden*, 387 U.S. at 307. They stated that "[a]pproximately 50 Phoenix Police Officers entered the scene," along with numerous other public safety personnel; that all of these public safety personnel except for plaintiffs and two other Phoenix police officers (identified by name and badge number) had already provided samples; and that such samples would be "analyzed for DNA and compared to other evidence in th[e] investigation" "[i]n attempts to identify the unknown DNA profile/s" found at the scene, and thus "may contribute to the identification of the individual who committed the felony offense described."

That plaintiffs had themselves already been excluded as suspects does not undermine the nexus between the evidence desired and the crime investigated; excluding public safety personnel as the source of DNA would plainly "aid in" the conviction of an eventual criminal defendant, by negating any contention at trial that police had contaminated the relevant evidence. *Messerschmidt v. Millender*, 132 S. Ct. 1235, 1248 n.7 (2012) (emphasis and citation omitted); *see also In re Morgenthau*, 457 A.2d 472, 473-76 (N.J. Super. Ct. App. Div. 1983) (per curiam) (affirming order compelling collection of "blood and hair samples and finger and palm prints" from individuals who were "not suspects" in a homicide investigation because these "physical exemplars constituted material evidence relevant to [the suspect's] guilt" and the orders, while not denominated as warrants, "comport[ed] with all the requisites of a search warrant"). We therefore conclude that the superior court orders authorizing the collection of plaintiffs' DNA satisfied the Warrant Clause of the Fourth Amendment. Given that conclusion, we need not address whether an exception to the warrant requirement would have applied in the absence of the orders.

**B.**

To be sure, "a search could be unreasonable, though conducted pursuant to an otherwise valid warrant, by intruding on personal privacy to an extent disproportionate to the likely benefits from obtaining fuller compliance with the law." *United States v. Torres*, 751 F.2d 875, 883 (7th Cir. 1984). The Fourth Amendment thus also requires an analysis of "the extent of the intrusion on [plaintiffs'] privacy interests and on the State's need for the evidence." *Winston v. Lee*, 470 U.S. 753, 763 (1985); *see also Spencer v. Roche*, 659 F.3d 142, 146 (1st Cir. 2011) (applying reasonableness analysis to bodily search conducted pursuant to warrant). Because "'intrusions into the human body'" implicate the "most personal and deep-rooted expectations of privacy," the Fourth Amendment requires "a discerning inquiry into the facts and circumstances to determine whether the intrusion was justifiable." *Winston*, 470 U.S. at 760 (quoting *Schmerber*, 384 U.S. at 767-68).

But no undue intrusion occurred here. The Supreme Court has expressly held that buccal swabs are "brief and . . . minimal" physical intrusions "'involv[ing] virtually no risk, trauma, or pain.'" *King*, 133 S. Ct. at 1979 (quoting *Schmerber*, 384 U.S. at 771). A buccal swab, like a breathalyzer test, does "not require piercing the skin and may be conducted safely outside a hospital environment and with a minimum of inconvenience or embarrassment." *Skinner v. Ry. Labor Execs.' Ass'n*, 489 U.S. 602, 625 (1989).

Moreover, the reasonableness of a particular search "must be considered in the context of the person's legitimate expectations of privacy." *King*, 133 S. Ct. at 1978. Although "policemen do not abandon their constitutional rights upon induction into the department," *L.A. Police Protective League v. Gates*, 907 F.2d 879, 886 (9th Cir.

1990) (citation and internal quotation marks omitted), the government's interest in the integrity of its police force "may justify some intrusions on the privacy of police officers which the fourth amendment would not otherwise tolerate," *Kirkpatrick v. City of Los Angeles*, 803 F.2d 485, 489 (9th Cir. 1986); *see also Biehunik v. Felicetta*, 441 F.2d 228, 231 (2d Cir. 1971) ("The policeman's employment relationship by its nature implies that in certain aspects of his affairs, he does not have the full privacy and liberty from police officials that he would otherwise enjoy."). It was hardly unreasonable here to ask sworn officers to provide saliva samples for the sole purpose of demonstrating that DNA left at a crime scene was not the result of inadvertent contamination by on-duty public safety personnel.

And, although we share plaintiffs' concerns over potential misuse of DNA samples to reveal private information about contributors, *see King*, 133 S. Ct. at 1979-80, no such danger is realistically posed here. The DNA Memo expressly guarantees plaintiffs' DNA samples "will be used for comparison to evidence in this report only" and "will not be used for any research type testing, including race, ethnicity or health," "provided to any outside organization for those purposes," "entered into the employee database," or "entered into CODIS."[5] The plaintiffs have not alleged any plausible reason to believe that the Phoenix Police Department will not abide by these limitations, and the district court did not err in declining to speculate about possible future abuse.

---

[5] Because the complaint quoted extensively from the DNA Memo, it was incorporated by reference and we may "assume that its contents are true for purposes of a motion to dismiss under Rule 12(b)(6)." *United States v. Ritchie*, 342 F.3d 903, 908 (9th Cir. 2003).

### III.

We **AFFIRM** the judgment of the district court.