Marcel ETCHEVERRY, Plaintiff,

v.

COUNTY COURT OF NASSAU COUNTY, Defendant.

No. 76 C 768.

United States District Court, E. D. New York.

June 10, 1976.

On Application for Certificate of Probable Cause June 16, 1976.

James J. McDonough, Legal Aid Society of Nassau County, Crim. Div., Mineola, N.Y. (Matthew Muraskin and Eugene Murphy, Mineola, N.Y., of counsel), for plaintiff.

Denis Dillon, Dist. Atty. of Nassau County, Mineola, N.Y. (William C. Donnino, Mineola, N.Y., and Anthony Girese, New York City, Asst. Dist. Attys. of counsel), for defendant.

## MEMORANDUM AND ORDER

PLATT, District Judge.

Under 28 U.S.C. § 2241(a) petitioner applies for a writ of *habeas corpus* to relieve him of an alleged illegal conviction claimed to have been imposed upon him by the State of New York in violation of the Constitution of the United States.

Petitioner was convicted upon his plea of guilty on or about July 1, 1974, of an attempt to commit the crime of possession of a weapon (a shotgun) as a felony and sentenced to a definite term of one (1) year. Prior to the entry of his plea of guilty petitioner moved for suppression of the shotgun and a switchblade knife on the grounds that the search and seizure of such weapons were in contravention of the Fourth Amendment to the United States Constitution.

After a suppression hearing the respondent (Tomson, J.) denied petitioner's motion to suppress and made the following findings of fact and conclusions of law in connection therewith and gave the following reasons therefor:

"In this hearing to suppress evidence, held pursuant to an Order of this Court (Tomson, J.) dated August 13, 1973, the defendant maintains that a sawed-off shotgun and a switchblade knife were obtained by police officers at premises known as 19 Perkins Avenue, Oceanside, pursuant to an unlawful search and seizure.

"The defendant has been charged in this matter by indictment, dated April 26, 1973, with possession of a weapon as a felony, namely a sawed-off shotgun; possession of a weapon, dangerous instrument and appliance as a felony, namely a switchblade knife and possession of a defaced firearm. The People intend to offer the seized items as evidence in relation to these charges.

"It was undisputed at the hearing that for some period of time prior to March 21, 1973, the date of seizure of the items, a warrant of arrest of the defendant on the ground of assault was pending and unexecuted.

"It is also undisputed that the defendant was apprehended on March 21, 1973, in the attic of 19 Perkins Avenue, Oceanside.

"There is a dispute in the testimony as to manner in which the police officers gained access to the house at 19 Perkins Avenue and indeed what conversations were had with Mrs. Jeanne Etcheverry, the mother of the defendant. Detective Rizzo testified that he knocked on the door and advised Mrs. Etcheverry that the officers had a warrant for the arrest of the defendant and that the warrant was displayed. Mrs. Etcheverry, her sister and her brother-in-law testified that two dogs which had been let out into the yard came bounding into the house and when Mrs. Etcheverry went to ascertain how the dogs got in she found four or five men inside the house. Police Officer Catalano also testified that Mrs. Etcheverry let the officers enter the house.

"Although the precise conversation between the officers and Mrs. Etcheverry seems to be in doubt, there is unanimity in the testimony that after the officers identified themselves and asked where the defendant was, Mrs. Etcheverry responded that he was upstairs. Detective Rizzo testified that before advising that he was upstairs, Mrs. Etcheverry first denied that the defendant was in the house.

"The testimony of both the People's witnesses and the defendant's is in substantial agreement that upon going upstairs the officers were unable to find the defendant until he was thereafter located in the attic of the house.

*Findings of Fact*

"The Court finds that two or three days prior to March 21, 1973, a confidential informant communicated with Police Officer John Catalano of the Crime Prevention Unit of the Nassau County Police Department and inquired whether the police were still looking for the defendant.

"On March 21, 1973, the informant advised Catalano that the defendant could be found at 19 Perkins Avenue, Oceanside and that the defendant had a sawed-off shotgun.

"Detective Michael Rizzo of the Fourth Squad was thereupon advised by telephone around 3:00 p. m. of the same day that the defendant was at the Perkins Avenue address and that he had a sawed-off shotgun. This address was the home of defendant's mother.

"Until March 21, 1973, the information available to Detective Rizzo indicated that the defendant was not at the Perkins Avenue house and that the first notification that the defendant was in the immediate area where the warrant could be executed resulted from the informant's communication on the same day.

"The police officers then proceeded to the premises for the purpose of executing the warrant of arrest for assault.

"When Detective Rizzo and several other officers arrived, other officers were already at the scene. Several officers were assigned to watch the perimeters of the premises.

"After being advised by Mrs. Etcheverry that the defendant was upstairs working in the bathroom, several officers, including Detective Rizzo and Officer Catalano, went upstairs to the bathroom and to a bedroom identified as the defendant's. The defendant could not be found in any of the rooms entered by the officers.

"While simultaneously looking for the defendant and also for the sawed-off shotgun, Detective Rizzo looked under the bed, under

the mattress and then opened the drawers of a dresser which was located in a corner of a closet in the bedroom (Def's Ex. E & F). In the other corner of the closet there was a quantity of clothing on a pole and directly overhead there was a movable trapdoor cover leading to the attic (Def's Ex. G). This trapdoor cover was in place.

"In one of the drawers of the dresser Detective Rizzo found a sawed-off shotgun and seven shells. The weapon and shells were immediately confiscated by the police (People's Ex. 1 & 2a). While going through the dresser drawers, Detective Rizzo was specifically looking for the sawed-off shotgun reported by the informant to be in the defendant's possession.

"The defendant could not be found in other parts of the house and a check was made with the officers on guard outside the house to ascertain if the defendant had come out.

"The clothing on the closet pole underneath the attic trapdoor was removed by Officer Catalano and laid on the bed in the room. In the course of removing the clothing, Catalano felt a hard object in one item of clothing which, from his experience as a police officer, he recognized as a knife. When removed the object proved to be a switchblade knife and the knife was thereupon seized by the police officer (People's Ex. 2b).

"The trapdoor cover was pushed open by the officers and they shouted through the attic opening for the defendant to come down. The defendant did not respond and the officers thereupon requested Mrs. Etcheverry's brother-in-law, Jean Bernard, who was in the house at the time, to go up into the attic first. He was advised by the officers to call out his name since the officers did not know if the defendant was armed.

"Mr. Bernard was boosted up through the attic opening and police officers followed, boosting each other up to the attic. The defendant was found hiding in the attic between the ceiling beams and he was placed in custody and handcuffed. He was thereupon searched but no weapons were found on his person.

"The defendant was assisted down through the attic opening and in descending from the attic it was necessary to brush up against the dresser in the closet where the sawed-off shotgun was found. As indicated previously, the clothing where the switchblade knife was found was underneath the attic trapdoor before the clothing had been removed.

"The time that elapsed from the time the officers entered the house until the defendant was found hiding in the attic and apprehended was approximately one hour. The dresser where the weapon was found was searched approximately twenty minutes after the officers entered the premises and the defendant was placed in custody about thirty minutes thereafter.

### Conclusions of Law

"The Court concludes as a matter of law that the primary purpose of entering the premises was to arrest the defendant pursuant to an outstanding warrant of arrest.

"That the entry of the premises at 19 Perkins Avenue, Oceanside, New York, was made under circumstances evincing reasonable cause to believe that the giving of notice would result in the defendant escaping or attempting to escape or in endangering the life or safety of the officers.

"That exigent circumstances existed by virtue of the necessity of making an immediate arrest of the defendant while his whereabouts within the immediate jurisdiction of the arresting officers was known. That under such circumstances and in a reasonable belief that the defendant had under his possession and control a weapon that could endanger the safety of the police officers, the search for the aforesaid weapon was incidental to and contemporaneous with the arrest of the defendant pursuant to the warrant of arrest.

"That the seizure of the switchblade knife was incidental to and contemporaneous with the arrest of the defendant pursuant to the warrant of arrest.

"That by virtue of the fact that the precise whereabouts of the defendant within the premises was unknown, during the course of secreting himself to avoid arrest, the search and seizure were conducted in an area within the defendant's immediate control.

### Reasons for Determination

"The facts in this matter are undisputed that on March 21, 1973, a valid warrant of arrest on a charge of assault was outstanding against the defendant, Marcel Etcheverry. In view of the nature of the information received and the fact that the defendant had not previously been at the Perkins Avenue address, immediate police action to execute the warrant was required.

"Since the principal purpose of the police action was to arrest the defendant and not to search for weapons as evidence of the commission of a crime, any delay would defeat the appropriate steps taken by the police. Manifestly, the defendant could flee and avoid apprehension and the fact that the defendant secreted himself in order to avoid arrest lends credence to this distinct possibility.

"It would be unreasonable to expect the officers not to take all precautions necessary to their safety upon entering the house where the defendant was located, particularly when information was received that the defendant had a weapon. Thus, in my opinion the police officers conducted a reasonable search of the immediate area in the course of their efforts to arrest the defendant. Indeed, the wisdom of such action is amply illustrated by the incidental finding of the switchblade knife in the clothing hanging directly beneath the defendant's hiding place.

"The law is abundantly clear that a search contemporaneous with an arrest is justified where the need exists to seize weapons and other things which might be used to assault police officers or to effect an escape. *Chimel v. California,* 395 U.S. 752, 763, 764 [89 S.Ct. 2034, 23 L.Ed.2d 685] (1969); *Preston v. United States,* 376 U.S. 364, 367 [84 S.Ct. 881, 11 L.Ed.2d 777] (1964); *Agnello v. United States,* 269 U.S. 20, 30 [46 S.Ct. 4, 70 L.Ed. 145] (1925).

"While it is true that a general search of the premises where an arrest is made would violate the principles of the Fourth Amendment, in the absence of a search warrant, the scope and extent of a search may be dictated by the particular circumstances under which a person may gain possession of weapons for use against the arresting officers. In *Chimel v. California* (supra) the United States Supreme Court, at page 763 [89 S.Ct. 2034], defined the area of permissible search in the following terms:

'A gun on a table or in a drawer in front of one who is arrested can be as dangerous to the arresting officer as one concealed in the clothing of the person arrested. There is ample justification, therefore, for a search of the arrestee's person and the area "within his immediate control"—*construing that phrase to mean the area from within which he might gain possession of a weapon* or destructible evidence.' (Emphasis supplied)

"A further illustration of the rule in this regard was indicated by Mr. Justice White, in his dissenting opinion in *Chimel* at page 773 [89 S.Ct. 2034]:

'Applying this reasonableness test to the area of searches incident to arrests, one thing is clear at the outset. Search of an arrested man and of the items within his immediate reach must in almost every case be reasonable. There is always a danger that the suspect will try to escape, seizing concealed weapons with which to overpower and injure the arresting officers, and there is a danger that he may destroy evidence vital to the prosecution. Circumstances in which these justifications would not apply are sufficiently rare that inquiry is not made into searches of this scope, which have been considered reasonable throughout.'

"In the circumstances of the case at bar where the defendant was hiding to avoid arrest a search of a dresser in a closet which contained an opening to an attic which proved to be the ultimate hiding

place of the defendant was certainly within an area where the defendant might reasonably gain possession of a weapon. Similarly, the seizure of the switchblade knife from the clothing in the closet was reasonable and proper. See also *United States v. Mulligan,* 488 F.2d 732 ([9 Cir.] Ct. of App.1973).

"The defendant contends that the search in this matter cannot be reasonable inasmuch as it preceded the arrest. While it is true that most of the reported cases involve searches subsequent to an arrest, it by no means follows that a prior search is *ipso facto* unreasonable simply for that reason.

"The principle to be gathered from a reading of the various authorities clearly is that a search is reasonable and will be upheld if it is incidental to and contemporaneous with an arrest.

"Judge Nathan R. Sobel in his publication entitled 'Recurrent Problems In Search and Seizure' states the appropriate rule, as follows:

'But if the police officer indeed has probable cause *before* he either arrests or searches, it is not essential that the arrest precede the search. It is sufficient if both are substantially contemporaneous.'

"See also *People v. Glover,* 17 N.Y.2d 429, 430 [266 N.Y.S.2d 519, 213 N.E.2d 800] (1965).

"Nothing contained in *Lee v. United States* [98 U.S.App.D.C. 97], 232 F.2d 354 (Ct. of App. 1956) is contrary to the above conclusions. In *Lee* a search prior to arrest was held illegal because the primary purpose of the entry into the premises in that matter was to search not to arrest. In the instant case it is clear that the primary purpose of the entry was to arrest.

"The application to suppress is accordingly denied."

Petitioner appealed from his judgment of conviction and on February 24, 1975, said judgment was unanimously affirmed without opinion by the Appellate Division, Second Department; whereupon petitioner again appealed and his judgment of conviction was unanimously affirmed by the New York Court of Appeals, 39 N.Y.2d 252, 383 N.Y.S.2d 292, 347 N.E.2d 654 (1976).

Both parties rely, at least in part, on *Warden, Maryland Penitentiary v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967).

In the *Hayden* case, the Supreme Court was principally concerned with whether a distinction should be made between a seizure of items of evidential value only and a seizure of instrumentalities, fruits or contraband. But the facts were not unlike those in the case at bar and some of the comments of the Court are pertinent. In that case, an armed robber entered the business premises of a taxicab company in Baltimore, Maryland, took some money and ran. Two cab drivers followed the man to a residential address and identified him as a Negro about 5'8" tall wearing a light cap and dark jacket. Within minutes police arrived at the house, knocked and announced their presence. They advised Mrs. Hayden that a robber had entered the house and requested permission to search the house. Mrs. Hayden did not object.

The police officers spread out through the first and second floors and the cellar and found Hayden in an upstairs bedroom feigning sleep. He was arrested when other officers reported that no one else was in the house. At about the same time another officer discovered a shotgun and a pistol in a flush tank and yet another officer found in a washing machine in the cellar a jacket and trousers of the type the fleeing man was said to have worn. Still another officer found a clip of ammunition for the pistol and a cap under the mattress of Hayden's bed, and ammunition for the shotgun was found in the bureau drawer in Hayden's room.

No search or arrest warrants were in the possession of the police officers when they made the above-described seizures and arrest.

Insofar as pertinent here, the United States Supreme Court held (387 U.S. at pages 298–300, 87 S.Ct. at pages 1645–1646):

"We agree with the Court of Appeals that neither the entry without warrant to search for the robber, nor the search for him without warrant was invalid. Under the circumstances of this case, 'the exigencies of the situation made that course imperative.' *McDonald v. United States,* 335 U.S. 451, 456, 69 S.Ct. 191, 193, 93 L.Ed. 153. The police were informed that an armed robbery had taken place, and that the suspect had entered 2111 Cocoa Lane less than five minutes before they reached it. They acted reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he had used in the robbery or might use against them. The Fourth Amendment does not require police officers to delay in the course of an investigation if to do so would gravely endanger their lives or the lives of others. Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that Hayden was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

"We do not rely upon *Harris v. United States, supra,* in sustaining the validity of the search. The principal issue in *Harris* was whether the search there could properly be regarded as incident to the lawful arrest, since Harris was in custody before the search was made and the evidence seized. Here, the seizures occurred prior to or immediately contemporaneous with Hayden's arrest, as part of an effort to find a suspected felon, armed, within the house into which he had run only minutes before the police arrived. The permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape.

"It is argued that, while the weapons, ammunition, and cap may have been seized in the course of a search for weapons, the officer who seized the clothing was searching neither for the suspect nor for weapons when he looked into the washing machine in which he found the clothing. But even if we assume, although we do not decide, that the exigent circumstances in this case made lawful a search without warrant only for the suspect or his weapons, it cannot be said on this record that the officer who found the clothes in the washing machine was not searching for weapons. He testified that he was searching for the man or the money, but his failure to state explicitly that he was searching for weapons, in the absence of a specific question to that effect, can hardly be accorded controlling weight. He knew that the robber was armed and he did not know that some weapons had been found at the time he opened the machine.[5] In these circumstances the inference that he was in fact also looking for weapons is fully justified." (Footnote omitted)

■ So also in the case at bar did the policemen act

"reasonably when they entered the house and began to search for a man of the description they had been given and for weapons which he * * * might use against them. * * * Speed here was essential, and only a thorough search of the house for persons and weapons could have insured that (the petitioner) was the only man present and that the police had control of all weapons which could be used against them or to effect an escape.

" * * * Here, the seizures occurred prior to * * * (petitioner's) arrest, as part of an effort to find a suspected felon, armed, within the house * * * (and) [t]he permissible scope of search must, therefore, at the least, be as broad as may reasonably be necessary to prevent the dangers that the suspect at large in the house may resist or escape."

The petitioner attempts to distinguish the *Hayden* case by claiming that "only if the search in our case were for the purpose of gaining control of weapons was it authorized" and that "clearly, such control existed prior to the search which was thus unnecessary and improper." The flaw in petitioner's argument, however, lies in the fact that

the officers had no way of knowing whether they had control of the shotgun which they had been informed was in the petitioner's possession until they found same.

 Moreover, quite apart from this fact and the reasons given by the Nassau County Court and the New York State Court of Appeals, the search in this particular case would appear to have been justified for two additional reasons: first, to eliminate any possible booby traps laid for anyone attempting to gain access to the attic through the trap door, and second, to determine whether the defendant was in fact armed with the shotgun in order to determine the extent of force needed to effect his arrest.

Either or both of these reasons would be sufficient, in this Court's opinion, to sustain the police officers' search prior to the arrest of the petitioner for a weapon known to be in his possession. Any other rule would require policemen to operate at considerable peril to themselves and possible danger to others.

Under all of the circumstances, this Court feels that there is no basis for petitioner's application for a writ of *habeas corpus* herein, and accordingly the same must be denied in all respects.

SO ORDERED.

### APPLICATION FOR CERTIFICATE OF PROBABLE CAUSE

On June 10, 1976, this Court denied petitioner's application for a writ of habeas corpus. By letter dated June 11, 1976, petitioner's counsel applied pursuant to Rule 22 of the Federal Rules of Appellate Procedure for a certificate of probable cause, on the ground that this case contains important issues of law concerning warrantless searches.

This Court finds, in light of *Warden v. Hayden,* 387 U.S. 294, 87 S.Ct. 1642, 18 L.Ed.2d 782 (1967), and the reasons given in the Memorandum and Order of June 10, that petitioner's arguments are not substantial or worthy of further consideration, see *United States ex rel. Winfield v. Cascles,* 403 F.Supp. 956 (E.D.N.Y.1975) (Supple-

mental Memorandum Order). Accordingly, we deny petitioner's application for a certificate of probable cause.

SO ORDERED.