Juan JIMENEZ, Appellant,

v.

The STATE of Texas, Appellee.

No. 08–87–00099–CR.

Court of Appeals of Texas,
El Paso.

March 2, 1988.

David C. Guaderrama, El Paso County Defender, El Paso, for appellant.

Steve Simmons, Dist. Atty., El Paso, for appellee.

Before OSBORN, C.J., and SCHULTE and FULLER, JJ.

## OPINION

OSBORN, Chief Justice.

This is an appeal from a jury conviction for burglary. The Appellant entered a plea of true to one enhancement count, and the court assessed punishment at eighteen years' imprisonment. We affirm.

Point of Error No. One asserts that the evidence was insufficient to support the conviction. At approximately 1:30 a.m., January 8, 1987, civilian eyewitnesses observed a burglary in progress at a Radio Shack store in West El Paso. An individual was seen passing boxes of merchandise into an older white Oldsmobile Cutlass. The vehicle left, heading north on Mesa Street. The witnesses notified the police, and the dispatcher issued a radio broadcast giving the vehicle's description and direction of travel. Within minutes, Officer Adame observed a 1970 white Oldsmobile Cutlass approaching from the direction of the Radio Shack. He stopped the vehicle to investigate. Before he even exited his patrol unit, the female driver of the subject vehicle and a male passenger approached Adame. She had no driver's license. Adame ordered them both to sit on the curb while he approached the Cutlass. Using his flashlight from outside the vehicle, he observed several VCRs and television sets on the rear seat. He also observed some movement on the rear floorboard which he believed could have been one or two additional subjects. He withdrew to his patrol vehicle to call for assistance. As he did so, he observed a figure crawl over the front seat, start the engine and drive off at a high rate of speed on Sunland Park Drive.

Adame followed in pursuit, leaving the other two subjects behind. The chase continued at high speed, with Adame two blocks behind the Cutlass. The road crossed some railroad tracks where the road surface rose to match the height of the railroad bed. The Cutlass struck bottom as it crossed the tracks. Adame lost sight of the vehicle for thirty to forty-five seconds as it descended the rise on the other side of the tracks. Adame crossed the tracks, scanning the road ahead for the subject vehicle. He then observed that the driver had lost control at a curve, a short distance ahead, leaving the road surface and crashing through a chainlink fence. Adame could not observe anyone in or around the vehicle. The driver's door was open, and stretched across the road surface were a baseball cap, a pair of sunglasses and a remote control for either a television or VCR. This location was actually 300 feet inside the New Mexico border. Adame reported the situation, calling for back-up units and notification of the Sunland Park, New Mexico, police authorities. The first to arrive was an El Paso police unit consisting of Officers Price and Loya. Then came El Paso Police Lieutenant Buonvino from the nearby Westside Substation. Next came Sunland Park, New Mexico Police Chief Garay, who formally took charge of the scene, vehicle and property on behalf of New Mexico.

In the interim, Officers Price and Loya were scanning the adjacent field for fleeing subjects. Officer Loya saw a head lifted and then quickly withdrawn. He and Price found the Appellant lying across the road from the subject vehicle. He was lying face down in some weeds in scrub brush next to a fence paralleling the roadway. He would not respond to questions. While skeptical of this apparent state of unconsciousness, the officers requested an ambulance. A New Mexico ambulance service arrived. Without passing upon the reality of the apparent unconsciousness, the ambulance personnel decided to transport Appellant to the nearest emergency room facility, that being at Providence Hospital in El Paso as opposed to the nearest New Mexico Hospital, forty miles away in Las Cruces. The EMS personnel attempted to insert a tracheal tube into Appellant's airway, which triggered a gag reflex. Testimony indicated that, while not unheard of, this was unusual in a true case of unconsciousness. Appellant began to rouse and indicated to the ambulance personnel that he was a pedestrian struck by the subject Cutlass automobile. Lieutenant Buonvino instructed Officers Price and Loya to follow the ambulance to Providence Hospital and, if it turned out that Appellant had not been struck by a vehicle and was released by the hospital, to place him under arrest for the burglary. A vehicle registration check had disclosed that the Cutlass was registered to the name Antunez.

At the hospital, Nurse Clark asked the officers Appellant's name. They indicated that they did not know. In response to her inquiry, Appellant indicated his name was Sanchez. Due to the underlying circumstances and the fact that the first nurse attending Appellant was wearing a name tag indicating Sanchez, the officers told Clark that Sanchez may not have been his true name. Both officers and Nurse Clark testified that there was no request that she investigate his identity on behalf of the police. She did remove several items from his pants pocket to attempt to confirm his identity for hospital record purposes. She found a Radio Shack receipt dated two days earlier made out to Fernando Nervaez

and a T.D.C. inmate grievance form receipt made out to Juan Jimenez. She turned these over to the police officers. Examination disclosed that Appellant had only minor abrasions. He was ambulatory, although limping slightly. The officers called the Westside Substation and reported the two slips of paper found in Appellant's pocket with two different names. They were instructed to place him under arrest and transport him to the police substation.

Meanwhile, back at the location of the Cutlass, Officer Adame had removed two purses from the vehicle in an effort to identify the female driver. Adame had earlier driven back to the area of the initial stop but predictably was unable to locate the other two subjects. The purses were taken to the El Paso Police Substation where the contents were inventoried. Adame found an El Paso Municipal Court bond receipt made out to Juan Jimenez. A Department of Public Safety replacement license receipt made out to Fernando Nervaez, and a vehicle title assignment made out to Fernando Nervaez. New Mexico Police Chief Garay directed that the vehicle be towed to Anthony, New Mexico. The most logical route led through a portion of Texas, passing close to the El Paso Police Substation. Garay directed that the New Mexico towing service stop by the substation, where he tendered the apparently stolen property to the El Paso authorities, receiving in exchange a property receipt. Later that night, Fernando Apodaca, the Radio Shack manager, visited the substation to identify the merchandise taken from his store. While there, he observed Appellant in a holding cell. At the substation and at trial, he identified the Appellant as having visited the store the day before the burglary, in the company of a second male subject. Appellant selected a VCR cable and called his companion to the register to pay for the item. Apodaca identified State's Exhibit No. Thirteen as the sales receipt made out to Fernando Nervaez and tendered it to Appellant at the store.

Appellant contends correctly that this is a circumstantial evidence case. He further

asserts that the State has necessarily relied upon the permissive inference of guilt which arises from unexplained possession of recently stolen property and that the evidence does not meet all of the criteria for such doctrine. We find no need to embroil our analysis in an artificial discussion of the elements of the aforementioned doctrine. As clarified in *Hardesty v. State*, 656 S.W.2d 73, 77 (Tex.Crim.App.1983), satisfaction of the inference requirements is merely a circumstance of guilt and not conclusive. All of the evidence in the case is still required to meet the applicable circumstantial evidence standard of review. Id. See also *Williams v. State*, 631 S.W.2d 171, 172–173 (Tex.Crim.App.1982). Prior cases referring to a "presumption of guilt" and apparently requiring no further evidentiary linkage between the defendant and the offense were clearly rejected in *Hardesty*. The simple question then becomes whether or not the evidence, viewed as a whole and in a light most favorable to the verdict, would allow any reasonable trier of fact to find each element of the offense beyond a reasonable doubt. Given the circumstantial nature of the proof, this also necessitates a determination of whether or not the evidence was sufficient for the jury to specifically reject any outstanding hypothesis except the guilt of the accused. *Williams*, at 173. The State need only refute such outstanding exculpatory theories as are reasonably raised by the evidence.

In this case, while the Appellant's brief abstractly speculates as to a variety of exculpatory theories, there is only one which is raised by the evidence. It is the theory consistently propounded by the Appellant to the ambulance personnel, the hospital staff, and Mrs. Antunez (the owner of the vehicle), namely that Appellant was a pedestrian struck by the fleeing vehicle. There was ample evidence from various sources to refute this assertion and justify its rejection by the jury. Officer Loya testified that, based upon his observation of Appellant first raising his head and then ducking down as the police vehicle approached him, he believed Appellant was feigning unconsciousness. Officer Price concurred, albeit without supportive factual detail. Examination by the officers, the ambulance personnel and the hospital staff failed to disclose any serious injury associated with being struck by a speeding vehicle. When the ambulance personnel attempted to insert a tracheal tube, Appellant gagged, a reflex normally not produced in a truly unconscious individual. Finally, there is the chain of identification through the documents found on Appellant's person and in the vehicle. Appellant argues that there is no evidence that the "Juan Jimenez" and "Fernando Nervaez" named on the items in the vehicle are the same person or persons listed on the items found on Appellant's person. The defensive assertion strains credulity, but is absolutely incredible considering all of the identification evidence. These two names are found both in Appellant's pocket and in the fleeing vehicle. What is more, the document bearing the Nervaez name in Appellant's pocket is a Radio Shack receipt, issued by the burglarized outlet one day before the burglary. The store manager positively identified Appellant as one of the two customers to whom the receipt was issued. In the vehicle, with the stolen Radio Shack merchandise, is the other documentation bearing the name Fernando Nervaez. Thus, the circumstantial chain linking Appellant to the vehicle and stolen merchandise is established both retrospectively from the hospital discovery and prospectively from the site of the offense. The evidence clearly and sufficiently refuted Appellant's claim of being an injured pedestrian and unequivocally places him in the vehicle. Certainly, much of the foregoing evidence serves not only to refute the outstanding exculpatory hypothesis, but also to circumstantially establish the elements of the offense. Flight and deception are additional criteria which will support a circumstantial conviction. *Hardesty*, at 77–78. Appellant's flight from the scene of the initial stop, his feigned unconsciousness and his use of a false name at the hospital satisfies such criteria. Point of Error No. One is overruled.

■ Point of Error No. Two asserts that the trial court erred in refusing to suppress the items seized from the Cutlass in New Mexico, contending that the El Paso officers were improperly acting outside their territorial jurisdiction. Appellant initially contends that the "hot pursuit" doctrine is inapplicable because Officer Adame lost visual contact with the fleeing vehicle for a period of thirty to forty-five seconds. Appellant has focused upon the language in the original opinion in *Minor v. State,* 153 Tex.Cr.R. 242, 219 S.W.2d 467, 469 (Tex.Crim.App.1949), in which the appellate Court upheld the "hot pursuit" arrest, stating:

> It should be remembered that after the flight began, appellant and his companion were never out of the sight of the pursuing officers; ....

We construe such language as merely emphasizing the quality of the hot pursuit evidence in that case and not as stating a prerequisite for a hot pursuit finding. In a concurring opinion, Judge Beauchamp described the doctrine as applying to a continuous pursuit without any break in the police effort to apprehend or in the subject's effort to escape. *Minor,* 219 S.W.2d at 470. This is the more reasoned explication. A momentary break in visual observation should not vitiate an otherwise valid hot pursuit. It is the overall continuity of the pursuit which should govern, particularly where a brief visual interruption does not in any way impugn the identification of the fleeing subject. The thirty- to forty-five-second gap in observation in this case is just such an inconsequential factor. The interruption was occasioned not by any loss of pursuit but by the mere passage of the vehicles over a rise in the road surface and the almost immediate loss of control on the part of the fleeing subject, causing his vehicle to leave the road surface. In time, the gap was between thirty and forty-five seconds. In distance, it was less than two city blocks. The fleeing vehicle came to rest in plain sight, a mere 300 feet inside the New Mexico border.

On rehearing, Judge Beauchamp stated: Certainly we cannot say the officers may invade the bounds of another country, or even another state of our government. The laws of the other state should be examined for that.

*Minor,* 219 S.W.2d at 472. Looking to the laws of the State of New Mexico, we find that Officer Adame, while engaged in "fresh pursuit" culminating in New Mexico, was inbued with the same authority to pursue and seize as any New Mexico peace officer. N.M.Stat.Ann. sec. 31–2–1 (Michie Repl.Pamph.1984). Furthermore, N.M.Stat.Ann. sec. 31–2–5 (Michie Repl.Pamph. 1984) prescribes that "[f]resh pursuit as used herein shall not necessarily imply instant pursuit, but pursuit without unreasonable delay." We find that Officer Adame's pursuit into New Mexico offended the laws of neither that jurisdiction nor Texas as they pertain to hot pursuit and territorial authority.

■ Appellant next asserts that even if the hot pursuit doctrine were applicable the seizure would not be proper because it was not incident to an extraterritorial arrest. As noted in J.W. Hall, *Search and Seizure,* sec. 7:5 (Lawyers Co–op.1982), the hot pursuit doctrine has been left primarily to trial court application with little effort at the appellate level (state or federal) to define its precise boundaries. The few appellate cases extant deal with arrest or search incident to arrest. The rationale expressed in those cases would seem equally applicable to a reasonable seizure of contraband, evidence or other property, despite the failure to effectuate an arrest at the time. That is particularly true in the present case where the officers possessed probable cause to arrest the Appellant and probable cause to believe that the merchandise previously observed in the vehicle had been stolen from the Radio Shack. That the officers deferred an arrest until hospital examination of the Appellant does not nullify either the preexisting probable cause or the reasonableness of the seizure of the property.

■ In *Warden, Maryland Pentitentiary v. Hayden,* 387 U.S. 294, 299, 87 S.Ct. 1642, 1646, 18 L.Ed.2d 782, 787–788 (1967), the Supreme Court declined to rely upon

the doctrine of search incident to arrest to uphold the seizure of weapons and clothing in a hot pursuit scenario. The ruling would no doubt have sanctioned the seizure of the stolen money had it been similarly discovered. The seizure of property in hot pursuit does not flow from the arrest itself. The timing and geographical parameters of the search are significantly different. The search and seizure flow not from the arrest but are of equal significance to the arrest, and are based directly upon the same exigencies. See J.W. Hall, *Search and Seizure,* sec. 7:8 (Lawyers Co–op.1982).

■■■ Finally, Appellant suggests that the absence of a more significant involvement by the New Mexico authorities invalidated the custody of this property by the El Paso Police. We would agree with Appellant that a proper seizure under the "hot pursuit" doctrine will not permit a summary removal of an arrestee or seized property from the state in which the seizure occurred. The doctrine permits a maintenance of custody by the foreign officer until the subject and the property may be subjected to the control of indigenous law enforcement personnel. Thereafter, the custody of the arrestee becomes a matter subject to the applicable laws of extradition. No such elaborate procedure exists with regard to the interstate transfer of the seized property. Absent specific guidelines, it would seem to this Court that the method of transfer, consistent with reasonable seizure and due regard for the interstate territorial issue, should (1) recognize the initial paramount authority of the state in which the seizure is made, (2) provide a record of the transfer, the individual authorizing the transfer and the party receiving the same, (3) safeguard the property itself, and (4) provide a reasonable protection for the various ownership rights and claims in the property. The procedure followed in this case represents due regard for the above factors. Regardless of whether the Sunland Park, New Mexico, police chief was summoned by Adame or the El Paso dispatcher, he did arrive and take charge of the scene. It was under his direction that the vehicle was towed by a New Mexico wrecker service to Anthony, New Mexico.

The configuration of roads in the area made the most reasonable route, one which passed in and out of Texas along Doniphan Road. It was further within the realm of reasonable conduct to make a brief detour and stop at the nearby El Paso Police Substation to transfer custody of the apparently stolen merchandise. The transfer was properly documented by receipt showing Police Chief Garay's authorization.

■■■ A separate question is posed by Adame's seizure of two purses from the vehicle interior prior to Chief Garay's arrival, the subsequent inventory of their contents and the discovery of the items exhibiting the tell-tale names "Fernando Nervaez" and "Juan Jimenez." The seizure and discovery may have been premature, but we find no reversible error in the failure to suppress the items under the rationale of inevitable legitimate discovery. *Miller v. State,* 667 S.W.2d 773, 778 (Tex. Crim.App.1984). The items would have been subject to inventory and discovery by the New Mexico authorities and to subsequent transfer by them to the El Paso Police.

■■■ While this Court feels the foregoing analysis is sufficient to uphold the seizures and admissions into evidence, we further conclude that the State's arguments as to abandonment and Appellant's lack of standing to contest the seizures are also applicable. While the federal courts have taken the initiative in developing the standing issue, it is not a factor peculiar to federal constitutional challenges. Standing is a function of the citizen's reasonable expectation of privacy, and as such has application in assessing challenges predicated solely upon Tex.Code Crim.Pro.Ann. arts. 1.06 and 38.23 (Vernon 1977 and Supp. 1988). Appellant's repeated assertions that he was a pedestrian struck by the subject vehicle eliminated his standing to complain of the resulting vehicular searches and seizures. Point of Error No. Two is overruled.

In Point of Error No. Three, Appellant challenges the seizure of the two documents from his pants pocket by Nurse

Clark at the hospital. Appellant's sole theory of impropriety is that Nurse Clark was acting as an agent of law enforcement personnel, a factor associated with Fourth Amendment challenge, not state statutory challenge. His cited authorities deal only with federal constitutional issues. No mention is made in the brief of Tex.Code Crim.Pro.Ann. art. 38.23 (Vernon Supp. 1988). We are therefore not confronted with the distinction between Texas and federal doctrines as to private party searches.

 Nurse Clark and Officers Price and Loya testified unequivocally that she was not asked or directed by law enforcement personnel to search Appellant or ascertain his identity on their behalf. She did so for hospital record purposes only. Even an ongoing practice by the hospital of turning property over to police in cases involved in police investigation does not render the voluntary private party conduct state action. Only if the individual or ongoing practice is instigated or arranged in concert with law enforcement personnel will the private actor be deemed a state agent. The analysis presented in *Vargas v. State*, 542 S.W.2d 151, 153–155 (Tex. Crim.App.1976), cert. denied, 429 U.S. 1109, 97 S.Ct. 1144, 51 L.Ed.2d 562 (1977), dealing with facts very similar to those before this Court, supports the trial court's decision to admit the challenged exhibits. Point of Error No. Three is overruled.

Point of Error No. Four asserts error in the failure to instruct the jury under Article 38.23. There were no factual issues in dispute regarding the various searches and seizures. Consequently, there was no error in refusing the requested instruction. *Marrs v. State*, 647 S.W.2d 286, 289 (Tex.Crim.App.1983). The evidence presented only legal issues to be resolved by the trial judge. The fact that Private Investigator Bonilla was improperly permitted to testify as to his "expert" opinion on such legal issues as to what constitutes "hot pursuit" does not convert such legal issues into factual questions for jury consideration. Point of Error No. Four is overruled.

The judgment is affirmed.