*If this opinion indicates that it is "FOR PUBLICATION," it is subject to revision until final publication in the Michigan Appeals Reports.*

# STATE OF MICHIGAN

# COURT OF APPEALS

PEOPLE OF THE STATE OF MICHIGAN,

Plaintiff-Appellee,

UNPUBLISHED
January 27, 2022

v

VASHON FLOWERS,

Defendant-Appellant.

No. 353346
Muskegon Circuit Court
LC No. 19-002979-FC

Before: GADOLA, P.J., and SWARTZLE and CAMERON, JJ.

PER CURIAM.

Defendant, Vashon Flowers, was convicted after a jury trial of first-degree murder, MCL 750.316, and was sentenced as a fourth-offense habitual offender, MCL 769.12, to life imprisonment. Defendant appeals as of right, challenging his conviction. We affirm.

## I. FACTS

This case arises from the shooting death of defendant's wife, Jamie Thomas-Flowers, in the early morning hours of May 19, 2019. Thomas-Flowers and defendant lived together at a residence in Muskegon Heights. The victim's daughter, Paris Jones, and her two-year-old son also lived in the home. On May 18, 2019, at approximately 6:00 p.m., Jones heard the victim and defendant arguing in their bedroom. According to Jones, defendant told the victim that he was going to the store, and the victim cautioned him not to buy cigarettes. The couple began to argue. Jones could see into the couple's bedroom and it appeared that a physical altercation was taking place. Jones approached the bedroom and saw defendant grab the victim by her ankle and pull her from the bed to the floor. Jones entered the bedroom and attempted to block the victim from defendant while telling the couple to calm down. According to Jones, defendant pushed her out of the way, then jumped on the victim and began choking her as the victim screamed. Defendant eventually stopped his assault on Thomas-Flowers and left the room.

According to Jones, the victim got up and told defendant "I can't believe you hit me, I can't believe you did this, I can't believe you put your hands on me, we're done, we're over." The victim then told defendant to take his belongings and leave. While Jones and the victim stood in the kitchen, defendant walked in and threw a lighter on the ground and the lighter exploded;

-1-

defendant then yelled in the victim's face. The victim again told defendant to leave, and defendant left shortly before 7:00 p.m.

Later that night, Jones went to sleep in her bedroom leaving a window open. Sometime later, Jones awoke hearing the victim and defendant arguing outside her window. She heard defendant ask the victim where she was going, heard the victim reply, then heard defendant say, "Oh, hell no you aren't going anywhere." From the sound of the voices, Jones concluded that defendant and the victim were walking to the front of the house. Jones then heard the front door slam and lock. Jones got out of bed and saw the victim standing in the house, visibly shaken, and trying to peer out the windows without being seen. When Jones asked the victim what was happening, the victim said "He's crazy, he was waiting out there for me. He was just standing out there waiting. I left to go pick up my brother and—and he just jumped from behind a tree and started asking me where I was going and what I was doing." According to Jones, the victim said that defendant "scared the sh*t out of" her, that she could see that defendant had a gun hanging out of his pocket, and that he smelled of liquor. Jones testified that she knew that defendant owned a gun and had seen defendant carrying the gun on a previous occasion.

While Jones and the victim were talking, defendant kicked the door of the house. Jones then heard popping and hissing noises as defendant slashed the tires of the couple's car that the victim drove. The victim yelled out the window at defendant that she was calling the police. Defendant was no longer at the residence when police arrived. According to Jones, the responding officer told them that he could not do much and left. The victim then locked the front door and put a chair underneath the door handle. The victim told Jones that she was going to watch a movie in her bedroom, and Jones went to bed.

Jones awoke at 6:00 a.m. to the sound of two loud bangs coming from the front door. Jones heard the victim run to the front door and shout "Vashon, just announce yourself" and "Vashon, you don't have to kick the damn door down just announce yourself." Jones heard one or two more kicks to the door, then the sound of wood cracking. Jones then heard another voice inside the house that she recognized as defendant's voice, say: "This is what we're doing, Jamie? This is how you're going to do me? This is what you're going to do to me? This is how you're going to do me?" Jones testified that the victim responded "There wasn't anything I could do, you were acting crazy. I had to call the police." Jones testified that defendant again said "This is what you're going to do? This is what you're going to do to me?" Jones said that the voices sounded as though the victim and defendant were moving into the living room. Jones picked up her phone and called 911, then heard the victim say: "You don't have to do this Vashon. Please don't do this, you don't have to do this Vashon." Jones then heard four gunshots.

Jones testified that she whispered into the phone to the dispatcher because she was afraid that defendant would kill her and her son. While talking to the dispatcher, Jones heard a shuffling sound, heard a door open, and then silence. Jones left her bedroom and saw that the chair was no longer barricading the front door, which had been kicked off its hinges. She then saw the victim lying on the floor of the laundry room. Jones again called 911 and reported that the victim had been shot by defendant. Jones testified that she was sure defendant was the person who shot the victim because she recognized his voice and heard the victim say his name several times immediately before being shot.

When officers arrived at the home, they observed that the front door had been kicked in and saw a shoe print on the door. Jones met the officers and told them "I think he killed my mom." Jones led the officers to the laundry room where they found the victim's body and four shell casings. The medical examiner determined that the victim's manner of death was homicide, and retrieved four fired bullets and one bullet fragment. Jones later found a tube sock containing 47 nine-millimeter bullets in the living room of the residence. The gun used to shoot the victim was never found.

While the officers investigated, Jones told them that defendant's brother, Kenyatta Flowers, was standing outside the home talking on a cell phone. When officers approached him, Kenyatta walked away. Officers thereafter spoke with Kenyatta in front of his residence, which was located down the street from the victim's home. Kenyatta allowed the officers to search his home for defendant, but defendant was not there.

Jones provided defendant's cell phone number to police officers. In an effort to locate defendant, police obtained a search warrant to do a locational search for defendant's phone. The locational search indicated that defendant's phone was likely in Kenyatta's house; police used that information to obtain a search warrant for Kenyatta's house. Meanwhile, officers learned that defendant had surrendered to police. Police officers then searched Kenyatta's house where they located defendant's cell phone in a shoe box in the living room. Officers also found shotgun shells and nine-millimeter bullets in the kitchen. Police searched the contents of defendant's cell phone and extracted data from the phone including an image of a semi-automatic handgun, and text messages from defendant's phone that had been sent to and from the victim's phone in the hours before the shooting. Police officers also obtained information from Google showing the location of the phone at various times.

At trial, the prosecution introduced evidence of the text messages defendant and the victim exchanged in the hours before the shooting. Following voir dire, defense counsel told the trial court that he had no objection to the admission of the text messages. The text messages from the victim to defendant that night included one stating "This marriage is over. You don't know how [sic] love and that definitely wasn't love and if it was its not enough unfortunately." Another text from the victim included a picture of a computer screen showing the web page divorcewriter.com, and a message stating "You're not helping yourself at all give me a gun if you want to talk—want talk you cut my tires you dumb as hell I never get back with you now police on the way for real Paris scared." At 6:01 a.m. on May 19, 2019, the victim sent a text message to defendant that said, "Yep, we officially no longer a couple." During that same time period, defendant sent messages to the victim stating "I love you" and "I love you forever. When you ready for me to come back home let me know. I'm hurt and beat down." At 6:36 a.m., Jones called 911 and reported the gunshots; at 6:39 a.m., Jones again called 911 and reported that the victim had been shot. The jury convicted defendant of first-degree murder. Defendant now appeals.

## II. DISCUSSION

### A. HEARSAY

Defendant contends that he was denied a fair trial because the trial court admitted certain statements that were inadmissible hearsay. Defendant also contends that defense counsel was ineffective for failing to object to the statements. We disagree.

We note initially that defendant's challenge to the statements in question is largely unpreserved. To preserve an evidentiary issue for review on appeal, the party challenging the admission of the evidence must object at trial asserting the same ground for objection asserted on appeal. *People v Thorpe*, 504 Mich 230, 252; 934 NW2d 693 (2019). In this case, defendant filed a motion in limine before trial seeking to exclude any testimony from Jones that the victim told Jones that defendant had a gun, thereby preserving that issue for review by this Court. Defendant did not object to the admission of the other statements defendant now challenges as inadmissible hearsay, thereby failing to preserve those challenges for review.

Ordinarily, we will not disturb a trial court's decision to admit evidence absent an abuse of the trial court's discretion. *Id*. A trial court abuses its discretion when its decision falls outside the range of principled outcomes, *id.*, or if it admits evidence that was inadmissible as a matter of law. *People v Denson*, 500 Mich 385, 396; 902 NW2d 306 (2017). We review de novo preliminary questions of law, such as whether a rule of evidence precludes the admission of particular evidence. *Id*. However, when an evidentiary issue is unpreserved, our review is limited to plain error affecting the defendant's substantial rights. *People v Chelmicki*, 305 Mich App 58, 62; 850 NW2d 612 (2014). We also observe that under MCL 769.26, "[n]o judgment or verdict shall be set aside or reversed or a new trial be granted by any court of this state in any criminal case, on the ground of misdirection of the jury, or the improper admission or rejection of evidence, or for error as to any matter of pleading or procedure, unless in the opinion of the court, after an examination of the entire cause, it shall affirmatively appear that the error complained of has resulted in a miscarriage of justice."

Generally, hearsay is not admissible unless it falls within an exception to the hearsay rule. MRE 802; *People v Gursky*, 486 Mich App 596, 606; 786 NW2d 579 (2010). Hearsay is defined by MRE 801(c) as "a statement, other than the one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." A statement is defined by MRE 801(a) as "(1) an oral or written assertion or (2) nonverbal conduct of a person, if it is intended by the person as an assertion." Commands are not assertions, and therefore are not statements as defined by MRE 801(a), and thus are not hearsay. *People v Bennett*, 290 Mich App 465, 483; 802 NW2d 627 (2010).

### 1. THE 6:00 P.M. ARGUMENT

Defendant challenges as inadmissible hearsay three groups of utterances that were introduced into evidence. The first group consists of three utterances that Jones testified the victim made to defendant during an argument at approximately 6:00 p.m. on May 18, 2019. Jones testified that the victim told defendant not to buy cigarettes at the store, that the victim told defendant that "I can't believe you put your hands on me, we're done," and that the victim told the

-4-

defendant to pack his bags and leave. These utterances, however, were not offered to prove the truth of the matter asserted; that is, the prosecution did not offer the utterances to prove that defendant was not to buy cigarettes, that defendant put his hands on the victim, that the victim and defendant were "done," or that defendant was to pack his bags. Rather, the prosecution introduced the utterances to prove that on the evening in question the victim and defendant had a heated argument from which defendant may have concluded that the victim was ending the relationship, thus providing defendant motive to shoot the victim.

As discussed, hearsay is an out-of-court statement offered to prove the truth of the matter asserted. MRE 801(c). An out-of-court statement offered to show the effect on the listener rather than to prove the truth of the matter asserted is not hearsay. *People v Gaines*, 306 Mich App 289, 306; 856 NW2d 222 (2014). Rather, such statements are "not offered for a hearsay purpose because [their] value does not depend upon the truth of the statement[s]." *People v Lee*, 391 Mich 618, 642; 218 NW2d 655 (1974). Because the three utterances here were offered to show that a quarrel occurred and likely had an effect on defendant rather than to prove the truth of the matters asserted, the utterances are not hearsay. In addition, the victim's directives to defendant to refrain from buying cigarettes and to pack his bags and leave were commands rather than assertions, and therefore were not statements under MRE 801(a), and thus are not hearsay. *Bennett*, 290 Mich App at 483. Because the utterances were not hearsay, they were not subject to exclusion as hearsay. In addition, because the utterances were not subject to exclusion as hearsay, defense counsel was not ineffective for failing to object to the introduction of the utterances as inadmissible hearsay. See *People v Head*, 323 Mich App 526, 539; 917 NW2d 752 (2018) (defense counsel is not ineffective for failing to raise a meritless objection).

## 2. THE EARLY MORNING ARGUMENT

The second group of utterances challenged by defendant as inadmissible hearsay consists of declarations that Jones testified the victim made to her following an encounter between the victim and defendant in the early morning hours of May 19, 2019. Jones testified that she awoke early on May 19, 2019, to hear the victim and defendant arguing outside her open bedroom window. Jones testified that shortly thereafter the victim entered the house through the front door, locked it, and attempted to peer out the windows without being seen. Jones testified that when she joined the victim in the living room, the victim appeared frightened and told her that "he's crazy he was waiting out there for me," and that defendant had "jumped from behind a tree and started asking me where I was going." When Jones asked if defendant had a gun the victim replied "[y]eah, it's hanging out of his pocket, he smells like liquor."

These statements were admissible under the present sense impression hearsay exception. A "present sense impression" under MRE 803(1) is "[a] statement describing or explaining an event or condition made while the declarant was perceiving the event or condition, or immediately thereafter." To qualify as a present sense impression, (1) the statement must provide an explanation or description of the perceived event, (2) the declarant must personally perceive the event, and (3) the explanation or description must be made while perceiving the event or condition, or immediately thereafter. *Chelmicki*, 305 Mich App at 63. Present sense impressions are presumed trustworthy because the simultaneous event and description leave no time for reflection, the likelihood of calculated misstatements is minimized, and typically the statement is made in the presence of another witness who may observe and verify its accuracy. *People v Hendrickson*, 459

Mich 229, 235; 586 NW2d 906 (1998) (opinion by KELLY, J.). In this case, the victim's statements to Jones described the encounter she just had with defendant outside the home, the statements were the victim's perceptions of the encounter, and the statements were made to Jones immediately upon the victim entering the home after Jones heard the victim and defendant arguing outside. These statements thus qualify as present sense impressions. See *Chelmicki*, 305 Mich App at 63.

These statements also were admissible under the excited utterance hearsay exception, defined in MRE 803(2) as "[a] statement relating to a startling event or condition made while the declarant was under the stress of excitement caused by the event or condition." To qualify as an excited utterance, a statement must (1) arise from a startling event or condition, (2) be made before there is time to contrive or misrepresent, and (3) must relate to the circumstance of the startling event. *People v Straight*, 430 Mich 418, 424; 424 NW2d 257 (1988). An excited utterance is admissible because the circumstances limit the possibility for conscious reflection and therefore for fabrication. *People v Smith*, 456 Mich 543, 551; 581 NW2d 654 (1998). This Court gives wide discretion to a trial court's determination that the declarant was under the stress of the event at the time the statement was made. *Id*. at 552.

According to Jones, the victim made the statements immediately upon entering the house after encountering defendant outdoors, the victim appeared shaken, and the statements arose from and were related to the encounter between the victim and defendant that Jones had just overheard outside the home. The statements therefore were admissible under the hearsay exception for excited utterances, and the trial court therefore did not abuse its discretion nor clearly err by admitting these statements. In addition, because the statements were not subject to exclusion as hearsay, defense counsel was not ineffective for failing to object to their introduction as inadmissible hearsay. See *Head*, 323 Mich App at 539.

## 3. THE TEXT MESSAGES

The third group of utterances that defendant challenges as inadmissible hearsay are the text messages between defendant and the victim on the night of May 18, 2019, and the early morning of May 19, 2019. The prosecution introduced text messages from the victim to defendant that night that stated "This marriage is over," a picture message that showed a computer screen with the web page divorcewriter.com open, and a message stating "You're not helping yourself at all give me a gun if you want to talk—want talk you cut my tires you dumb as hell I never get back with you now police on the way for real Paris scared." Another text from the victim stated "You pushed my daughter and my grandson is scared and you're not allowed to be around him ever again. My daughter feared for me, her and LJ that's a done deal." Another text from the victim stated "You a fake ass boy you ain't walking the street with no ID and a gun on you save them lies for your momma." At 6:01 a.m. on May 19, 2019, the victim sent a text message to defendant that said, "Yep, we officially no longer a couple."

As discussed, an out-of-court statement offered to show the effect on the listener rather than to prove the truth of the matter asserted is not hearsay. *Gaines*, 306 Mich App at 306. Here, the messages from the victim to defendant asserting that the marriage was over, that she did not want to reunite with defendant, and that the police were on the way were not offered to prove that the marriage was over or that the police were on the way, but instead offered to demonstrate that the victim and defendant were continuing to quarrel and that defendant might have believed that

the victim was ending the relationship and had called the police, thus demonstrating a motive for defendant to shoot the victim. Because the texts were offered to show the likely effect on defendant rather than to prove the truth of the matters asserted, the texts are not hearsay and thus were not subject to exclusion as hearsay.

In addition, because the utterances were not subject to exclusion as hearsay, defense counsel was not ineffective for failing to object to the introduction of the utterances as inadmissible hearsay. See *Head*, 323 Mich App at 539. We also observe that defense counsel's decision not to object to the text messages was a matter of trial strategy. The effective assistance of counsel is presumed, *People v Lockett*, 295 Mich App 165, 187; 814 NW2d 295 (2012), and the defendant must overcome the strong presumption that counsel's performance arose from sound trial strategy. *People v Trakhtenberg*, 493 Mich 38, 52; 826 NW2d 136 (2012). Defense counsel's conduct does not fall below an objective standard of reasonableness if the court can conceive of a legitimate strategic reason for that conduct. See *People v Clark*, 330 Mich App 392, 427; 948 NW2d 604 (2019). A trial strategy is not ineffective merely because it is unsuccessful, nor because it involved a calculated risk. *People v White*, 331 Mich App 144, 149; 951 NW2d 106 (2020). A review of the record in this case suggests that defense counsel chose not to object to the text messages to permit the introduction of the text messages favorable to defendant. Defense counsel highlighted the text messages in which defendant told the victim "I love you," "I never [meant] to cause you no pain," and "[w]hen you are ready for me to come back home let me know. I'm hurt and beat down." These statements arguably demonstrate that defendant was conciliatory toward the victim rather than angry. Defense counsel's decision not to object to the text messages because certain of the messages show defendant in a favorable light was a legitimate trial strategy, and his representation was not rendered ineffective merely because it did not result in acquittal.

## B. OTHER ACTS EVIDENCE

Defendant next contends that the trial court erred by admitting under MCL 768.27b evidence that he previously engaged in other acts of domestic violence.[1] Defendant argues that

---

[1] MCL 768.27b(6) defines domestic violence for purposes of that section as:

(a) "Domestic violence" or "offense involving domestic violence" means an occurrence of 1 or more of the following acts by a person that is not an act of self-defense:

(*i*) Causing or attempting to cause physical or mental harm to a family or household member.

(*ii*) Placing a family or household member in fear of physical or mental harm.

(*iii*) Causing or attempting to cause a family or household member to engage in involuntary sexual activity by force, threat of force, or duress.

the evidence should have been excluded under MRE 403 because it was unduly prejudicial. We disagree.

MRE 404(b)(1) provides that "[e]vidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show action in conformity therewith." Thus, evidence of a defendant's other acts generally is not admissible to demonstrate the defendant's propensity to commit similar acts. *People v Railer*, 288 Mich App 213, 219; 792 NW2d 776 (2010). However, in cases alleging domestic violence, MCL 768.27b permits the admission of evidence for any relevant purpose that the defendant committed other acts of domestic violence, including for the purpose of showing a defendant's propensity to commit domestic violence. See *Railer*, 288 Mich App at 219. MCL 768.27b provides, in relevant part:

> (1) Except as provided in subsection (4), in a criminal action in which the defendant is accused of an offense involving domestic violence or sexual assault, evidence of the defendant's commission of other acts of domestic violence or sexual assault is admissible for any purpose for which it is relevant, if it is not otherwise excluded under Michigan rule of evidence 403.
>
> * * *
>
> (4) Evidence of an act occurring more than 10 years before the charged offense is inadmissible under this section unless the court determines that 1 or more of the following apply:
>
> * * *
>
> (d) admitting the evidence is in the interest of justice.

Although MCL 768.27b permits the admission of evidence of other acts of domestic violence, the statute also provides that other acts evidence is not admissible if exclusion is

---

(*iv*) Engaging in activity toward a family or household member that would cause a reasonable person to feel terrorized, frightened, intimidated, threatened, harassed, or molested.

(b) "Family or household member" means any of the following:

(*i*) A spouse or former spouse.

(*ii*) An individual with whom the person resides or has resided.

(*iii*) An individual with whom the person has or has had a child in common.

(*iv*) An individual with whom the person has or has had a dating relationship. . . .

warranted under MRE 403, which provides that relevant evidence "may be excluded if its probative value is substantially outweighed by danger of unfair prejudice." "[E]vidence is unfairly prejudicial when there exists a danger that marginally probative evidence will be given undue or preemptive weight by the jury." *People v Musser*, 494 Mich 337, 357; 835 NW2d 319 (2013) (quotation marks and citation omitted).

In this case, TG, defendant's former girlfriend, testified that one day while she and defendant were dating in 2013, defendant approached her while she was outside her aunt's house, said "[y]ou going to play me like this?" and then hit TG, causing her to fall against the house. Defendant argues that TG's testimony was not relevant and was unfairly prejudicial. TG's testimony, however, was relevant to demonstrate defendant's propensity to physically assault his girlfriend. In addition, the statement made by defendant to TG during the 2013 domestic violence incident was similar to the statement made by defendant to the victim in this case. Further, defendant did not demonstrate that the probative value of the evidence was substantially outweighed by the danger of unfair prejudice; here, the evidence did not invite the jury to give marginally probative evidence undue weight. See *id*. Accordingly, the trial court did not abuse its discretion by admitting the evidence.

Defendant also argues that the trial court erred by admitting the testimony of AG, also a former girlfriend of defendant, under MCL 768.27. AG testified that while she and defendant were dating on May 29, 2008, the two argued, and defendant began choking her and pushed her against a wall. When defendant let go of her throat, AG grabbed a knife and ran into a bathroom. Defendant prevented her from closing the bathroom door, took the knife from her, pushed her into the bathtub, then jumped on top of her, cutting her face.

We observe that the trial court did not admit AG's testimony under MCL 768.27b as propensity evidence because the 2008 alleged assault occurred more than 10 years before the charged offense. See MCL 768.27b(4). However, the trial court found the evidence admissible under MCL 768.27, which provides:

> In any criminal case where the defendant's motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing an act, is material, any like acts or other acts of the defendant which may tend to show his motive, intent, the absence of, mistake or accident on his part, or the defendant's scheme, plan or system in doing the act, in question, may be proved whether they are contemporaneous with or prior or subsequent thereto; notwithstanding that such proof may show or tend to show the commission of another or prior or subsequent crime by the defendant.

Defendant argues that AG's testimony was improperly admitted under MCL 768.27 as propensity evidence. Defendant references statements made in the prosecutor's closing argument, which defendant alleges amount to an improper propensity inference based on AG's testimony. The trial court, however, instructed the jury that AG's testimony could not be used to determine defendant's propensity to commit crimes. The trial court instructed the jury that the evidence presented by AG could be considered only to show that the defendant had a reason to commit the crime, that the defendant specifically meant to assault [AG], that the defendant acted purposefully and not by accident or mistake or because he misjudged the situation, and that the defendant used

a place, system, or characteristic scheme that he has used before or since. We presume that the jury followed their instructions. *People v Stevens*, 498 Mich 162, 177; 869 NW2d 233 (2015). Although the prosecutor may have attempted to make an improper propensity argument using AG's testimony, the trial court did not abuse its discretion by admitting the evidence and properly instructed the jury as to the limits of its use.

## C. LAY OPINION TESTIMONY

Defendant also contends that the trial court erred by permitting Detective Jason Hartman to testify regarding cell phone locational information. Defendant argues that Hartman was not qualified as an expert by the trial court, and that Hartman's testimony exceeded the scope of lay witness testimony on the subject of cell phone locational information. Defendant also asserts that defense counsel's failure to object to Hartman's lay opinion testimony resulted in ineffective assistance of counsel warranting a new trial. We note initially that defendant did not challenge Detective Hartman's testimony regarding cell phone location information at trial, and therefore we review this unpreserved issue for plain error affecting defendant's substantial rights. See *Chelmicki*, 305 Mich App at 62.

MRE 702 governs expert testimony and states:

If the court determines that scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert by knowledge, skill, experience, training, or education may testify thereto in the form of an opinion or otherwise if (1) the testimony is based on sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

MRE 701 permits the admission of lay opinion testimony, and provides:

If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness and (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue.

Generally, a lay witness's testimony must not derive from scientific, technical, or other specialized knowledge based on the witness's knowledge, experience, or training. See *People v Dobek*, 274 Mich App 58, 77; 732 NW2d 546 (2007). However, under MRE 701 a lay witness may give opinion testimony that helps to establish "a clear understanding of the witness' testimony or the determination of a fact in issue." See also *People v Daniel*, 207 Mich App 47, 57; 523 NW2d 830 (1994). Generally, the opinion testimony of a lay witness is proper when it "do[es] not involve highly specialized knowledge, and [is] largely based on common sense." *People v McLaughlin*, 258 Mich App 635, 658; 672 NW2d 860 (2003). When a police officer provides testimony based upon his or her training and experience, however, the interplay between MRE 701 and MRE 702 is somewhat unclear. *People v Dixon-Bey*, 321 Mich App 490, 497; 909 NW2d 458 (2017). Further, when a witness provides lay opinion testimony based on his or her personal

experience and knowledge and could have been qualified as an expert, error in failing to qualify that witness as an expert may be harmless. See *Dobek*, 274 Mich App at 76-79.

In this case, Detective Hartman was not qualified by the trial court to testify as an expert, and to the extent that he offered his opinion it was lay opinion testimony governed by MRE 701. Hartman testified in part about the maps created by police based upon the locational data related to defendant's cell phone. The exhibits created from the locational data showed defendant's phone at his home, the scene of the shooting, at about 7:00 p.m. on May 18, 2019, and again in the area of the residence shortly after 2:30 a.m. on May 19, 2019. From 5:22 a.m. on that morning until the phone was seized by police officers during their search, the locational data showed the phone located at Kenyatta's house. Following voir dire, defense counsel told the trial court that he did not object to the admission of the maps.

On appeal, defendant challenges two areas of Detective Hartman's testimony as exceeding the scope of lay testimony and warranting qualification as an expert, being Hartman's testimony regarding how the locational data of a cell phone is acquired and Hartman's description of the maps depicting the data that Google provided regarding the location of defendant's cell phone. The explanation of how cell phone locational information is acquired is based upon technical or other specialized knowledge, and as such is arguably beyond the common knowledge of the average juror, and thus properly the realm of expert testimony. As cell phones have become common devices used daily by virtually all members of our society, however, the technology of cell phones increasingly has entered the realm of common knowledge; it seems fairly certain that most members of the general public are aware that the location of one's cell phone is continually tracked and recorded. In any event, in this case Hartman's testimony did not stray so far into the realm of expert testimony as to result in a miscarriage of justice. Hartman testified about his experience as a police officer with cell phone locational information and the information in this case that explained and supported his testimony regarding the location of defendant's cell phone at the relevant times.

Hartman's testimony about what the maps showed was based rationally on his perception of the maps and was helpful to a clear understanding of a fact in issue, specifically, the location of defendant's cell phone in the hours before the shooting. See MRE 701; see also *People v Fomby*, 300 Mich App 46, 50-52; 831 NW2d 887 (2013). Because Hartman's testimony rested upon his own rational perceptions and was helpful to explain his own testimony, we perceive no error warranting reversal. Moreover, the record suggests that Hartman could have been qualified as an expert regarding the locational information, rendering the admission of such information in the form of lay testimony harmless error. See *Dobek*, 274 Mich App at 76-79.

We also observe that the cell phone locational information did not place defendant at the scene of the murder at the time of the murder; to the contrary, the locational information indicated that defendant's cell phone was at his brother's house at the time of the murder. Rather, other considerable evidence presented at trial placed defendant at the scene of the murder at the time of the murder. We therefore detect no error affecting defendant's substantial rights, nor does it affirmatively appear that the error complained of has resulted in a miscarriage of justice. MCL 769.26. Accordingly, we find that counsel was not ineffective for failing to object to Hartman's testimony. See *Head*, 323 Mich App at 539.

## D. CUMULATIVE ERROR

Defendant contends that the alleged errors in the admission of hearsay testimony, other acts evidence, and improper lay person testimony resulted in cumulative error warranting reversal. We review an assertion of cumulative error by examining the actual errors identified on appeal to determine whether the cumulative effect of those errors deprived the defendant of a fair trial. *People v LeBlanc*, 465 Mich 575, 591 n 12; 640 NW2d 246 (2002). However, when no error has been established there can be no cumulative effect of errors warranting reversal. *People v Green*, 313 Mich App 526, 537; 884 NW2d 838 (2015). Because defendant in this case has not demonstrated error by the trial court, no cumulative effect of error exists.

## E. SEARCH WARRANT

Defendant contends that the trial court erred by admitting into evidence the results of the forensic search of his cell phone. He argues that the affidavit supporting the warrant used to obtain the information did not demonstrate facts to establish a link between the cell phone and the alleged criminal activity, and thus did not demonstrate probable cause to search the phone. Defendant also contends that defense counsel was ineffective because he failed to move to suppress the evidence obtained from the forensic examination of the cell phone. We conclude that any error in the introduction of the search history discovered on defendant's cell phone was harmless.

We observe initially that defendant's evidentiary challenge is unpreserved because defendant did not challenge the admission of the evidence before the trial court asserting the same basis for objection now asserted on appeal. *Thorpe*, 504 Mich at 252. Specifically, a defendant who challenges the admissibility of evidence on Fourth Amendment grounds must object to the admission of the evidence before the trial court on that same basis. *People v Hughes*, 506 Mich 512, 522-523; 958 NW2d 98 (2020). We review this unpreserved issue for plain error affecting defendant's substantial rights. *Chelmicki*, 305 Mich App at 62.

Both the United States and Michigan Constitutions guarantee the right of persons to be free from unreasonable searches and seizures. US Const, Am IV; Const 1963, art 1, § 11; *People v Hughes (On Remand)*, ___ Mich App ___, ___; ___ NW2d ___ (2021) (Docket No. 338030); slip op at 5. Thus, whether a search is lawful depends upon whether it is reasonable. *People v Mahdi*, 317 Mich App 446, 457; 894 NW2d 732 (2016). Generally, a search conducted without a warrant and without probable cause to believe that evidence of wrongdoing might be located at the place to be searched is per se unreasonable. *Id*. at 458. Absent circumstances falling within an exception to the warrant requirement, when evidence is obtained in contravention of the constitutional protection against unreasonable searches, under the judicially created exclusionary rule the evidence must be excluded. *Hughes*, ___ Mich App at ___; slip op at 5.

A search warrant may be issued for any property that is evidence of a crime or criminal conduct. MCL 780.652(1)(d). A search warrant must "particularly describ[e] the place to be searched and the persons or things to be seized," US Const, Am IV, as well as the alleged criminal activity that justifies the warrant. *Hughes*, 506 Mich at 538. To find probable cause to justify a search, there must be a substantial basis for inferring a fair probability that contraband or evidence of a crime will be found in a particular place. *People v Kazmierczak*, 461 Mich 411, 417-418; 605 NW2d 667 (2000). The Fourth Amendment protection against unreasonable searches and seizures

extends to cell phones, *Hughes*, 506 Mich at 527, and "as with any other search conducted pursuant to a warrant, a search of digital data from a cell phone must be 'reasonably directed at uncovering' evidence of the criminal activity alleged in the warrant." *Id*., 506 Mich at 538 (citation omitted).

Probable cause must be established by facts presented by oath or affirmation to the issuing judge or magistrate. *People v Waclawski*, 286 Mich App 634, 698; 780 NW2d 321 (2009). The affidavit submitted in support of probable cause must contain facts rather than mere conclusions or beliefs, *id*., and also must provide some context that connects the particularized venue to be searched and the objects to be seized with the suspected criminal behavior. *Hughes*, 506 Mich at 538. "There must, of course, be a nexus . . . between the item to be seized and criminal behavior. Thus . . . , probable cause must be examined in terms of cause to believe that the evidence sought will aid in a particular apprehension or conviction." *Id*. at 538-539, quoting *Warden v Hayden*, 387 US 294, 307; 87 S Ct 1642; 18 L Ed 2d 782 (1967). The affiant's experience is a relevant consideration to establish probable cause. *Waclawski*, 286 Mich App at 698.

When assessing a magistrate's conclusion that probable cause to search existed, we consider the underlying affidavit in a "common sense and realistic manner," *People v Russo*, 439 Mich 584, 604; 487 NW2d 698 (1992), and inquire "whether a reasonably cautious person could have concluded that there was a 'substantial basis' for the finding of probable cause." *Id*. at 603 (citation omitted). In this case, the search warrant at issue was supported by an affidavit from Detective Winston, which stated:

> Based on training and experience, Affiant is aware that those individuals that commit crimes often carry their cellular telephones on their person during the time period leading up to, during, and immediately after the time they commit said crime. Affiant is also aware, based on training and experience, that those that commit a crime will often use their cellular telephone to plan, execute, or otherwise communicate about said crime before, during, or immediately after the commission of the crime. Affiant is aware, based on training and experience, that cellular telephones retain location data and communications for a period of time, and that law enforcement can often access this information even if it has been deleted by the user. Affiant is aware that the contents of a cellular telephone that is owned or used by a person during the commission of a crime can be a valuable investigative tool to determine what occurred between a victim and a perpetrator of a crime before the commission of said crime.

Detective Winston's affidavit also included facts in support of a determination that defendant shot the victim, specifically, that Jones had told police that defendant was the person who shot the victim. The affidavit, however, fails to connect defendant's cell phone to the crime committed; that is, there are no specific facts in the affidavit that connect information potentially stored on defendant's cell phone to the shooting. The sole connection asserted in the affidavit between the data potentially stored on defendant's cell phone and the shooting was the officer's assertion that in his experience individuals who commit crimes store evidence of the crimes on their phones, which undoubtably is true but alone is insufficient to establish probable cause with respect to defendant's cell phone in connection with the victim's murder. To say generically that criminals often leave evidence of their crimes on their cell phones, without more, is insufficient to establish probable cause that evidence of this particular crime would be found on this particular

cell phone. We therefore conclude that a reasonably cautious person could not have concluded that there was a substantial basis for finding a fair probability that evidence of the crime would be found on defendant's cell phone. See *Kazmierczak*, 461 Mich at 417-418.

However, defendant has not shown that the admission of that evidence affected the outcome of the trial. The evidence discovered from the search of defendant's cell phone and admitted at trial was a picture of a gun and text messages between defendant and the victim. At trial, there was ample evidence that defendant possessed a gun, and defense counsel chose not to object to the introduction of the text messages, some of which arguably benefited defendant.

Moreover, the evidence supporting conviction in this case was overwhelming. Jones testified that defendant and the victim quarreled the night before the shooting and that the quarrel escalated to defendant physically attacking the victim. The victim demanded that defendant leave the home. Defendant returned in the middle of the night, and Jones heard him arguing with the victim outside the home, after which the victim came into the house, told Jones that defendant had a gun and was acting crazy, and called the police. Defendant then apparently vandalized the victim's car parked outside the home. Early the next morning, Jones heard someone kick the door from its hinges, then heard the victim call defendant by name repeatedly while pleading with him. Jones then heard defendant speaking to the victim, followed by four gunshots. Immediately thereafter, Jones found the victim in the laundry room dead from gunshot wounds. Given the strength of the evidence presented at trial, the introduction of the information gathered from the search of defendant's phone was not outcome-determinative, and defendant therefore has not demonstrated plain error affecting his substantial rights.

In addition, defense counsel was not ineffective for failing to move to suppress the contents seized from the cell phone. See *Head*, 323 Mich App at 539. As discussed, defense counsel's decision not to move to suppress the contents seized from the cell phone was a legitimate trial strategy, and his representation was not rendered ineffective merely because it did not result in acquittal. See *White*, 331 Mich App at 149.

Affirmed.

/s/ Michael F. Gadola
/s/ Brock A. Swartzle
/s/ Thomas C. Cameron